Exhibit C
to Franchise Offering Circular

FRANCHISE AGREEMENT


DATED    *1-28-04*


STORE NO. *1328*



EXHIBIT
B

Case 3:11-cv-00124-RJC -DSC    Document 1-2    Filed 03/11/11    Page 1 of 74

# FRANCHISE AGREEMENT

## TABLE OF CONTENTS

1. Grant of Franchise ............................................................................................................... 4

2. Acknowledgement of Franchisee ..................................................................................... 5

3. Location of the Franchised Business; No Exclusive Territory or Other Rights ............... 5

4. Training Program ............................................................................................................... 7

5. Consulting Services ........................................................................................................... 8

6. Site Approval ..................................................................................................................... 8

7. Conduct of the Franchised Business ................................................................................. 9

8. Service Marks; Proprietary Information ......................................................................... 15

9. Franchise Fee; Royalties; Advertising Fees; Financing Fee ........................................... 18

10. Financial Reporting; Evaluations; Audits ..................................................................... 20

11. Guaranty of Franchisee's Obligations .......................................................................... 21

12. Indemnification .............................................................................................................. 22

13. Confidentiality; Restriction on Hiring; Covenant Not to Compete ............................. 22

14. Transfer of the Franchised Business; Assignment of Franchise Rights ....................... 24

15. Term; Renewal ............................................................................................................... 27

16. Termination .................................................................................................................... 28

17. Rights and Obligations of the Parties upon Expiration or Termination ....................... 32

18. Survival .......................................................................................................................... 33

19. Relationship of the Parties ............................................................................................ 34

20. Provisions ....................................................................................................................... 34

21. Affiliates ......................................................................................................................... 34

22. Notices ............................................................................................................................ 34

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 2 of 74

23. Successors and Assigns .................................................................................................. 34

24. Amendment, Modification, Waiver or Deferral ............................................................ 35

25. Severable Provisions; Enforceability ............................................................................ 36

26. Entire Agreement ........................................................................................................... 36

27. Terminology .................................................................................................................... 36

28. Counterparts ................................................................................................................... 36

29. Arizona Law to Govern; Jurisdiction ........................................................................... 37

30. Arbitration ...................................................................................................................... 37

31. Attorneys' Fees ............................................................................................................... 38

32. Remedies Cumulative ..................................................................................................... 38

33. Construction .................................................................................................................... 38

34. Additional Actions ......................................................................................................... 38

35. Computation of Time ..................................................................................................... 38

36. Currency ........................................................................................................................... 38

37. Authority .......................................................................................................................... 39

38. Executive Order 13224 .................................................................................................. 39

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 3 of 74

that Franchisee's rights pursuant to this Agreement are probationary and temporary during the Probationary Period (as defined below), as set forth in Section 15 of this Agreement.

2. **Acknowledgement of Franchisee.** Franchisee acknowledges that, except as expressly set forth in the Franchise Offering Circular delivered to Franchisee (the "Offering Circular"), neither Franchisor, nor anyone acting on behalf of Franchisor, has made any claims or representations whatsoever regarding potential sales, profits or earnings achievable by Franchisee in connection with the conduct of the Franchised Business. Franchisee acknowledges that he has been informed and he understands that the successful operation of the Franchised Business will depend primarily upon the efforts, capabilities and management skills of Franchisee and general economic conditions and trends, and that he cannot rely upon the information set forth in the Franchise Offering Circular as representations or warranties of the results that will be achieved by Franchisee in connection with his operation of the Franchised Business. Franchisee acknowledges and confirms that he has selected, or will select, the premises in which the Franchised Business will be established and operated by him, and that the decision to establish and operate the Franchised Business at those premises was, or will be, made solely by him, without any reliance upon any information provided (if any), recommendation made (if any) or approval given (if any) by Franchisor, any area developer, Cold Stone Creamery Leasing Company, Inc. or any of their respective shareholders, directors, officers, employees, representatives, agents or affiliates. Franchisee accepts full responsibility for the consequences of his decision.

3. **Location of the Franchised Business; No Exclusive Territory or Other Rights.**

(a) Franchisee must operate the Franchised Business at a location selected by Franchisee that is within the geographic area identified in <u>Exhibit A</u>, subject to the approval of that location by Franchisor, which approval may not be unreasonably withheld.

(b) (i) Notwithstanding anything contained in this Agreement to the contrary, no exclusive territory or other exclusive rights are granted to Franchisee and, accordingly (other than as set forth in Section 3(c)), Franchisor and/or its Affiliates (as defined below) may establish other franchised or company-owned restaurants or other businesses, that may or may not use the Service Marks, that may compete with Franchisee's Franchised Business. In addition, Franchisor and/or its Affiliates may market, directly or indirectly, products and/or services under the Service Marks (or under other trademarks) through methods of distribution other than restaurants operated by Franchisor and/or its Affiliates and franchisees.

(ii) Franchisee acknowledges that Franchisor presently intends to develop Franchised Businesses (including licensed, franchised and company-owned restaurants) throughout the United States and internationally and that one or more future Franchised Businesses (including licensed, franchised and company-owned restaurants) may have an adverse effect on the revenues and profitability of existing Franchised Businesses, including Franchisee's Franchised Business. Franchisee further acknowledges that Franchisor has not made any representation or agreement, or provided Franchisee any assurance, that no future Franchised Business (including licensed, franchised and company-owned restaurants) would adversely affect the revenues and profitability of Franchisee's Franchised Business.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 4 of 74

# FRANCHISE AGREEMENT

AGREEMENT, dated as of the date set forth on the last page of this Agreement, by and between COLD STONE CREAMERY, INC., an Arizona corporation ("Franchisor"), whose principal business address is 16101 N. 82nd Street, Suite A-4, Scottsdale Arizona 85260 (phone number 480-348-1704; fax number 480-348-1718), and the franchisee identified on the last page of this Agreement ("Franchisee"), whose address, phone number and fax number are set forth on the last page of this Agreement.

## RECITALS

A.     Franchisor, under the Service Marks (as defined below), has, as a result of significant time, effort and money, originated a unique and comprehensive system for the manufacture and restaurant sale of premium fresh made ice cream and frozen yogurt (prepared using proprietary recipes) and an assortment of complementary toppings and mix-ins (the "Franchised Business");

B.     Franchisor owns certain intellectual property, including, without limitation, trade secrets and other confidential and proprietary information, processes, materials and rights relating to the development, promotion and operation of the Franchised Business (the "Proprietary Information");

C.     Franchisor has developed a system or business, including the Proprietary Information, for conducting and operating the Franchised Business under the Service Marks (the "Program");

D.     Franchisee desires to obtain a franchise from Franchisor for the right to use the Service Marks and the Proprietary Information for operating the Franchised Business, and to obtain the benefits and knowledge of the Program (the "Franchise");

E.     Franchisor is willing to grant a Franchise to Franchisee; and

F.     The restrictions and controls on Franchisee's operations contained in this Agreement are intended solely to protect the rights to the Service Marks and to fulfill Franchisor's obligation to other franchisees to maintain a high quality of products and services provided under the Service Marks.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the parties agree as follows:

1.     **Grant of Franchise.** Subject to and in accordance with the terms of this Agreement, Franchisor grants to Franchisee, and Franchisee accepts, a Franchise for the right to conduct the Franchised Business, with the nonexclusive right to use, solely in connection with the Franchised Business, the Service Marks and the Proprietary Information.  Franchisee must conduct the Franchised Business under the Service Marks.  The parties acknowledge and agree

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 5 of 74

(c) (i) Except as set forth in Section 3(d), in the event that Franchisor and/or its Affiliates decide to establish any other franchised or company-owned Cold Stone Creamery® restaurant at a site (the "New Location") located within the Applicable Radius (as defined below) of the location at which Franchisee's Cold Stone Creamery® restaurant is then located, Franchisor will first offer Franchisee the opportunity to own and operate the Franchised Business at the New Location. (Unless a specific location is identified in Exhibit A, until Franchisee has signed a lease or sublease with respect to a specific location which has been approved by Franchisor, no right of first refusal will apply.) Notwithstanding the first sentence of this Section 3(c)(i), if the New Location is within Franchisee's Applicable Radius and is also subject to a right of first refusal for the benefit of another franchisee of Franchisor, Franchisee will not have a right of first refusal pursuant to this Section 3(c), or any other rights, with respect to the New Location. If Franchisee intends to exercise its right of first refusal, Franchisee must, within 15 business days after notice from Franchisor to Franchisee, sign and deliver to Franchisor, with respect to the New Location, the form of franchise agreement then being signed by new franchisees, and Franchisee will be subject to the terms of that franchise agreement (including the Royalties, Advertising Fees, the Financing Fee and other charges).

(ii) For purposes of this Agreement, the term "Applicable Radius" means a three-mile radius or, if less, the radius (rounded up to the next one-half mile) determined by measuring a population of 50,000 around the location at which Franchisee's Cold Stone Creamery® restaurant is then located. The Applicable Radius will be determined from time-to-time, including any time that Franchisor and/or its Affiliates decide to establish any other franchised or company-owned Cold Stone Creamery® restaurant which might trigger this Section 3(c). The source of the population statistics for purposes of this Section 3(c) will be determined by Franchisor, in its sole discretion. All distances contemplated by this Section 3(c) will be measured at the storefront entry, by global positioning satellite system or other measurement device selected by Franchisor, in its sole discretion.

(d) (i) Notwithstanding anything contained in this Agreement to the contrary, the right of first refusal contained in Section 3(c) will not be applicable with respect to Cold Stone Creamery® restaurants owned or operated (i) by a franchisee who Franchisor believes intends to own or operate 10 or more Cold Stone Creamery® restaurants in accordance with an understanding or agreement with Franchisor that provides for regional or national establishment of Cold Stone Creamery® restaurants by that franchisee (such as airport and mall locations) or (ii) in certain dense retail traffic areas designated by Franchisor (such as Las Vegas, Honolulu and the New York metropolitan area), retail restaurant locations being sublet under lease to a master concessionaire and other unique or non-traditional marketplaces (in Franchisor's sole discretion), such as kiosks, carts, cafeterias, convenience stores, malls, stadiums, entertainment pavilions, amusement parks, sports or entertainment venues, airports, train stations, travel plazas, toll roads, military bases, prisons, hospitals, hotels, casinos and high school and college campuses. Franchisee will not have a right of first refusal with respect to those locations. Further, if Franchisee owns or operates a Cold Stone Creamery® restaurant in any of those locations, Franchisee will not have any right of first refusal.

(ii) Notwithstanding anything contained in this Agreement to the contrary, the right of first refusal contained in Section 3(c) will not be applicable at any time that Franchisee (or his Principals, officers, managers or employees) is in breach of any of his (or

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 6 of 74

their) obligations under, or related to, this Agreement (including the Events of Default) or any other agreement with Franchisor or its Affiliates (whether or not Franchisor has given Franchisee notice of that breach), and for the three-month period after that breach has been cured.

(e)     Franchisor reserves the right to market products and/or services under the Service Marks (or under other trademarks) or otherwise on the internet. Franchisee may not market his Cold Stone Creamery® restaurant or use the Service Marks on the internet.

4.     Training Program.

(a)     Franchisee (or, if Franchisee is a corporation, partnership, limited liability company or other entity, a Principal) and his managers must attend and satisfactorily complete the entire instruction provided by Franchisor (the "Training Program"). (If more than one person signs this Agreement, both or all must attend and satisfactorily complete the Training Program.) The cost of attendance and participation in the Training Program (excluding Franchisee's expenses, such as travel, lodging and meal expenditures in connection with attending the Training Program) for Franchisee (or a Principal) and one additional person is included in the Franchise Fee (as defined below). However, Franchisee's attendees at the Training Program will not be deemed to be employees of Franchisor, but will be deemed to be employees of Franchisee. If Franchisee (or any of his attendees) fails to provide Franchisor at least 14 days' advance notice of his cancellation of any portion of the Training Program, Franchisee will be assessed a $200 no-show fee, payable upon Franchisee's failure to cancel. Franchisor may waive the requirement for subsequent managers to attend the Training Program if he/she can obtain satisfactory training from Franchisee.

(b)     The Training Program will include classroom training and on-the-job training, as stated in the Franchise Offering Circular. The training program will begin after Franchisee's Sublease (as defined below) has been signed and before Franchisee's store build-out has been completed, at a time selected by Franchisor.

(c)     Training for more than two people will be provided by Franchisor if Franchisor's policies require more than two people to be trained or if Franchisee requests that additional people be trained (and Franchisor agrees to do so). The cost for additional training is $1,000 per additional Training Program per person. Training of the additional people may or may not be held at the same time as training of the initial two people, at Franchisor's election. All Training Program attendees bear their own travel, lodging and meal expenditures in connection with attending the Training Program.

(d)     In the event that Franchisee (or, if Franchisee is a corporation, partnership, limited liability company or other entity, a Principal) fails to satisfactorily complete Franchisor's Training Program, in the sole discretion of Franchisor, Franchisor may require Franchisee to attend the Training Program again, at his expense ($1,000 per additional Training Program per person, plus travel, lodging and meal expenditures in connection with attending the Training Program). In the event that Franchisee (or, if Franchisee is a corporation, partnership, limited liability company or other entity, a Principal) fails to satisfactorily complete Franchisor's Training Program, in the sole discretion of Franchisor, the second time, or refuses to attend the

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 7 of 74

Training Program a second time, Franchisor may terminate this Agreement. In that event, (i) the Franchise Fee paid by Franchisee will not be refunded and (ii) Franchisee must return to Franchisor all materials delivered to him in connection with the Franchise.

(e)     Franchisor may establish additional training programs or refresher courses, which Franchisee will attend, at his expense. Franchisor may impose a charge for Franchisee's failure to attend such programs and courses.

(f)     Prior to attending Franchisor's Training Program, Franchisee must attend and satisfactorily complete, at his expense, a cake decorating course approved by Franchisor.

(g)     Notwithstanding the above, unless Franchisor determines otherwise, Franchisee will not be entitled to attend Franchisor's Training Program with respect to Franchisee's (or his Affiliates') second and subsequent franchise agreements, or in connection with a transfer to or from an entity that is majority-owned by Franchisee, at Franchisor's expense.

5.     Consulting Services. Franchisor will consult with Franchisee by telephone, Monday through Friday 8:00 a.m. to 5:00 p.m. (Phoenix, Arizona time), with respect to all aspects of starting and operating the Franchised Business. Franchisor may, in its sole discretion, and depending upon the geographic proximity between Franchisee and Franchisor, if Franchisor's time permits, provide on-site consultation at Franchisee's request at Franchisor's then-current hourly rate (including consultation and travel time), plus travel, lodging and meal expenditures, at times agreed upon between Franchisee and Franchisor.

6.     Site Approval.

(a)     (i)     Franchisor will, within 90 days after it receives notice of Franchisee's selection, review and approve, or deny approval of, the site, within the area designated in this Agreement, Franchisee chooses for his Franchised Business. Franchisor will consider the potential customer base, the rental costs, competition, traffic patterns, population density and composition, visibility, proximity to other Franchised Businesses and other business factors of the site in determining whether to grant its approval of the site. Franchisor will not unreasonably withhold its approval of the site.

(ii)     Franchisor will, within 60 days after it receives the lease for the site Franchisee chooses for his Franchised Business, review and approve, or deny approval of, that lease. Franchisor may require the lease to contain appropriate provisions, including the permitted uses of the premises and the right to permit Franchisor to assume the lease in the event of Franchisee's breach of or default under the lease or upon the termination of this Agreement, and may require other revisions to the lease. Franchisee must engage a real estate broker or local attorney approved by Franchisor to assist Franchisee in its negotiations. If Franchisee uses a local attorney not approved by Franchisor, Franchisee must pay Franchisee a fee in an amount up to $3,000 in connection with Franchisor's review of the lease.

(b)     Franchisor or its Affiliate may lease the site selected by Franchisee for his Franchised Business and sublease the site to Franchisee. At Franchisor's request, Franchisee must promptly sign and deliver to Franchisor or its Affiliate an Agreement of Intent to Sublet,

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 8 of 74

substantially in the form attached to the Offering Circular as <u>Exhibit G</u>, and pay to Franchisor, its Affiliate or the landlord an amount, as security deposit and initial rent, equal to two month's rent. Promptly after Franchisor or its Affiliate signs a lease with the landlord of Franchisee's site, Franchisee must sign and deliver to Franchisor or its Affiliate a Sublease, substantially in the form attached to the Offering Circular as <u>Exhibit H</u> (the "Sublease"), as well as the form of guaranty of lease that the landlord may require. Neither Franchisor nor its Affiliates are obligated to enter into a lease for the site; Franchisor may require Franchisee to sign the lease directly with the landlord, in its sole discretion. If Franchisor so requests, Franchisee must promptly sign the lease, in substantially the form approved by Franchisor, directly with the landlord.

(c)     Any relocation of Franchisee's Franchised Business must be for a legitimate business reason and will be subject to a $5,000 relocation fee, payable upon Franchisor's approval of Franchisee's request for relocation. Any relocation of Franchisee's Franchised Business will be subject to Franchisor's approval, which may be granted or withheld, in Franchisor's sole discretion. In addition, Franchisee must sign the form of franchise agreement then being signed by new franchisees and will be subject to the terms of that franchise agreement (including the Royalties, Advertising Fees, the Financing Fee and other charges), other than the franchise term. In connection with any relocation, Franchisee's Franchised Business may not be closed for business for more than 30 days.

7.     **Conduct of the Franchised Business.**

(a)     Franchisor will lend to Franchisee, upon satisfactory completion of the Training Program, one copy of Franchisor's Operating Manual (which is comprised of a series of volumes under various titles), for use by Franchisee strictly in accordance with the terms of this Agreement during the term of this Agreement. Franchisee must operate the Franchised Business strictly in accordance with Franchisor's Operating Manual, as amended from time to time, and with the rules, regulations, instructions, policies and procedures as may from time to time be issued by Franchisor for the conduct of the Franchised Business as Franchisor may, in its sole discretion, deem appropriate.

(b)     (i)     Franchisee must offer and sell at the premises of the Franchised Business all products designated by Franchisor, consistent with Franchisor's comprehensive standards and requirements. In addition, Franchisee must incorporate into the Franchised Business all new products and services designated by Franchisor and must participate in all local, regional and promotional programs, initiatives and campaigns adopted by Franchisor that Franchisor requires Franchisee to participate in.

(ii)     Franchisor reserves the right to designate, in its sole discretion, which of its franchisees may, or will be required to, participate in new product or service tests, new or modified product or service offerings and other programs, initiatives and campaigns that Franchisor may, from time-to-time, develop. If Franchisor designates Franchisee for participation in any such program, initiative or campaign, Franchisee must participate when and as required by Franchisor.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 9 of 74

(c)     Franchisee must not offer or sell any products or services at or from the premises of the Franchised Business, or conduct any other business at or from the premises of the Franchised Business, unless Franchisor specifically approves the offering and sale of those products or services, which approval may be withheld by Franchisor, in its sole discretion. In addition, Franchisee may not offer or sell any products or services specified by Franchisor in any configuration, form or manner (including items for resale) other than that specifically approved by Franchisor.

(d)     Franchisee must operate the Franchised Business with the highest integrity and good business standards, and must use his best efforts to enhance, to the satisfaction of Franchisor, the goodwill associated with the Service Marks. In connection therewith, Franchisee must not disparage to any person Franchisor, its employees and representatives, its products or the Service Marks.

(e)     (i)     In order to maintain the high standards of product and service quality and consistency associated with the Service Marks, and the uniformity of the Franchise, Franchisee must purchase all food, supplies, equipment, signage, decor and other items from vendors and suppliers on Franchisor's list of approved vendors and suppliers (as it may exist from time to time), which Franchisor will lend to Franchisee for use by Franchisee in accordance with the terms of this Agreement. Franchisee must subscribe to Franchisor's provider of Muzak® (or other provider of musical programming designated by Franchisor) and play Franchisor's custom programming (or other musical programming designated by Franchisor) at the Franchised Business. Franchisee may request that Franchisor add certain vendors or suppliers to Franchisor's list of approved vendors and suppliers by notifying Franchisor in writing. Franchisor may require Franchisee to submit samples or specifications for examination or testing, at Franchisee's expense, to determine if the supplies or products meet Franchisor's specifications in such areas as weight, size, shape, delivery, performance, consistency, warranties, design, appearance, atmosphere and price. Franchisor will advise Franchisee of its approval or denial of approval within 45 days after receipt of all applicable information.

(ii)     In order to resolve previous difficulties franchisees have experienced in receiving their equipment and signage and to maintain the high standards of product quality and product consistency associated with the Service Marks, Franchisee must purchase the equipment and signage for the Franchised Business through Franchisor or its Affiliates from certain vendors selected by Franchisor. Simultaneously with signing this Agreement, Franchisee must sign and deliver to Franchisor an Equipment and Signage Agreement, in substantially the form attached to the Offering Circular as <u>Exhibit I</u>. Franchisee must pay Franchisor or its Affiliates, by certified or cashiers' check, the cost of that equipment and signage (including sales and/or use taxes) before the order is placed with those vendors. Franchisor or its Affiliates will coordinate the ordering and delivery of that equipment and signage. In addition to the price Franchisee will pay to Franchisor or its Affiliates for the equipment and signage, Franchisee will pay Franchisor or its Affiliates a fee in an amount equal to 4% of the cost of the equipment and signage (the "Equipment Fee").

(f)     Franchisee must cause the Franchised Business premises to be constructed, equipped and decorated in strict compliance with Franchisor's requirements and in accordance with Franchisee's plans and specifications, as have been approved by Franchisor. If these

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 10 of 74

requirements, plans and specifications are not followed in all significant respects or if changes were not approved in writing by Franchisor prior to being implemented, Franchisee may not open the Franchised Business to the public. Franchisee must engage licensed contractors and architects, who are subject to Franchisor's approval, obtain appropriate construction documents, and all mechanical, plumbing, electrical and architectural plans must be sealed and stamped, as Franchisor may require, even if the site's local government does not require same.

(g)     (i)     Franchisee must cause the Franchised Business to be consistent in color, design and style with the standards adopted and approved by Franchisor from time to time. Franchisee must maintain the appearance and atmosphere of the Franchised Business in accordance with the standards that Franchisor may adopt from time to time. If Franchisor so requests, Franchisee, at his expense, must remodel and update the Franchised Business to Franchisor's then current standards; provided, however, that no such remodeling or updating requirement will be imposed more frequently than (a) in the case of a major remodel/update, every 60 months and (b) in the case of a minor remodel/update or "spruce up," every 30 months. A minor remodel/update will not cost more than 5% (7.5% in the case of franchises located in Hawaii, Alaska or the Caribbean and 20% in the case of franchises located in the New York metropolitan area) of the cost of building out a Cold Stone Creamery® restaurant, averaged over the 6-month period preceding Franchisor's request to remodel (based on the franchisees opening their franchises for business within such 6-month period). Whether a remodeling/update is major or minor will be determined by Franchisor, in its sole discretion.

(ii)     All personnel employed by Franchisee in connection with the Franchised Business must wear a uniform or other clothing approved by Franchisor.

(iii)     Any variations in color, design, style, appearance or atmosphere must be approved in writing by Franchisor.

(h)     (i)     The Franchised Business must be (a) personally supervised by Franchisee or by a Principal or (b) directly supervised "on-premises" by a manager who has satisfactorily completed Franchisor's Training Program, unless Franchisor has waived that requirement. If supervised by a manager, the manager must spend at least 40 hours per week on the premises of the Franchised Business overseeing the operation of the Franchised Business.

(ii)     Franchisee (or, if Franchisee is a corporation, partnership, limited liability company or other entity, a Principal), and Franchisee's manager, if it has one, must be present and work at the Franchised Business during its grand opening (at least two to four days before the opening and the first two to three days after the opening).

(i)     Franchisee must keep the Franchised Business open to the public:

(i)     Seven days each week;

(ii)     A minimum of eight hours each day, Sunday through Thursday, and a minimum of ten hours each day, Friday and Saturday; and

(iii)     Between 7:00 p.m. and 10:00 p.m. each day.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 11 of 74

Those requirements may be waived by Franchisor, in its sole discretion. It is recommended that Franchisee keep the Franchised Business open to the public during the following hours: Sunday through Thursday, 11:00 a.m. to 10:00 p.m.; Friday and Saturday, 11:00 a.m. to 11:00 p.m.

(j)     Franchisor may evaluate and inspect the Franchised Business during regular business hours and from time to time to verify compliance with the terms and conditions of this Agreement, to confirm whether the quality of service and products is being maintained to Franchisor's satisfaction and for any other purpose related to this Agreement and the relationship between the parties, and Franchisee will permit Franchisor and its representatives access to its business premises.

(k)     Franchisor or its representatives or agents may meet and communicate with, and solicit information from, Franchisee's past and present employees, vendors and customers to verify compliance with the terms of this Agreement, to confirm whether Franchisee is performing his obligations to those employees, vendors and customers and for any other purpose related to this Agreement and the relationship between the parties, and Franchisee will assist and cooperate with Franchisor and its representatives in that regard.

(l)     In order to promote and protect the reputation of Franchisor and Franchisor's other franchisees and to maintain satisfactory public confidence, Franchisor or its representatives or agents may meet and communicate with, and solicit information from, any of Franchisee's customers to confirm the quality and the adequacy of the products and services provided by Franchisee.

(m)     As a service to Franchisee and other franchisees of Franchisor, Franchisor may, but is not obligated to, utilize its experience and the data obtained from all of its franchisees to establish and maintain a suggested schedule of prices for products and services of the Franchised Business. However, Franchisor may not attempt to establish or enforce any required schedule of prices for products and services of the Franchised Business and Franchisee will set the prices for products and services of the Franchised Business.

(n)     (i)     Franchisee must participate in the cooperative advertising association in his marketing area, as designated by Franchisor, in its sole discretion. Franchisor may change, dissolve or merge any of the cooperative advertising associations. The franchisees within each marketing area will administer the cooperative advertising associations, which may assess a fee for administration or advertising.

(ii)     In connection with the grand opening of the Franchised Business, Franchisee must conduct a grand opening marketing and advertising campaign in accordance with a plan approved by Franchisor prior to the grand opening. You may be required to spend up to $2,500 in connection with that grand opening and advertising campaign.

(o)     Franchisee must obtain and maintain all licenses and permits required to be held by Franchisee in connection with the conduct of the Franchised Business and must comply with all applicable federal, state and local laws, regulations and ordinances in connection with the

conduct of the Franchised Business. Franchisee must give Franchisor written notice of Franchisee's receipt of an unsatisfactory or failing health department inspection report within three days after Franchisee's receipt of that report.

(p) Franchisee must pay when due all debts and obligations incurred by Franchisee in connection with the conduct of the Franchised Business, including all applicable tax liabilities.

(q) (i) Franchisee must obtain and maintain during the term of this Agreement, liability insurance in the minimum amount of $1,000,000 combined single limit for injury to persons or property and sufficient extended coverage insurance to allow replacement of the restaurant in the event of loss. In addition, Franchisee must obtain and maintain business interruption insurance in the amount of at least $50,000. These insurance policies must name Franchisor, Cold Stone Creamery Leasing Company, Inc. and Franchisee's area developer (if any) as an additional insured. The insurance must be placed with an insurance carrier or carriers satisfactory to Franchisor, must be satisfactory in form to Franchisor and may not be subject to cancellation or any material change except after 30 days' prior written notice to Franchisor. The insurance policies must provide that no failure of Franchisee to comply with any term, condition or provision of the contract, or other conduct by Franchisee, will void or otherwise affect the protection afforded to Franchisor, Cold Stone Creamery Leasing Company, Inc. or Franchisee's area developer under the policy. Certificates of insurance with respect to these insurance policies must be provided to Franchisor with respect to all insurance policies in effect during the term of this Agreement, promptly after the issuance of the insurance policies and as may be requested by Franchisor.

(ii) If Franchisee sustains a loss by reason of fire, flood or other casualty of a type typically covered by insurance, and such casualty is caused wholly or partially by Franchisor's (or its Affiliates') acts or omissions, Franchisee must look solely to the proceeds of Franchisee's insurance policy for reimbursement of the loss, and neither Franchisee nor any insurance carrier may recover damages against Franchisor (or its Affiliates) by way of direct action, subrogation, assignment of claims or otherwise. Franchisee waives all such rights of recovery by Franchisee, any insurance carrier or other person, and agrees to notify each insurance carrier of this provision.

(iii) If Franchisee fails to pay any premium when due or any policy is in default, Franchisor may, but will not be obligated to, pay any premium and/or take any action necessary to cure the default. In this event, Franchisee must immediately pay to Franchisor the amount so paid by Franchisor or the amount expended by Franchisor to cure such default, plus interest at the rate of 18% per annum from the date paid or expended by Franchisor.

(r) Franchisee must attend, at his expense, all annual and other meetings and conference calls of franchisees that Franchisor determines are mandatory for all franchisees, or groups of franchisees (as designated by Franchisor), such as franchisees within a particular geographic region. Franchisor may impose a charge for Franchisee's failure to attend such meetings and conference calls.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 13 of 74

(s)     Franchisee must maintain an e-mail address for purposes of communicating with Franchisor, Franchisee's area developer and other persons. Franchisee must inform Franchisor and Franchisee's area developer of his e-mail address promptly upon signing this Agreement and if his e-mail address is changed. Franchisee should check and respond to his e-mail on a daily basis (except for weekends); provided, however, that the timeliness of Franchisee's e-mail review and responses must be consistent with reasonable business practices and must not cause Franchisor, area developers or other franchisees to be unable to communicate with Franchisee in a timely manner.

(t)     Franchisor will be entitled to use the name, likeness and voice of Franchisee and its Principals, officers, managers and employees for purposes of promoting the Franchise, Franchisor and its products, including all photos and audio and video recordings of Franchisee and its Principals, officers, managers and employees, and Franchisee hereby irrevocably consents thereto. Franchisee acknowledges that Franchisor will own all right, title and interest, to the extent allowed by law, in all rights of integrity, disclosure and publication and any other rights that may be known as or referred to as "moral rights," "artist's rights," "publicity rights" or the like associated with such photos and audio and video recordings, and assigns and transfers unto Franchisor the full and exclusive right, title, and interest to such publicity rights. At Franchisor's request, Franchisee will obtain from any or all of its Principals, officers, managers and employees written consent, in such form as Franchisor may request.

(u)     (i)     If Franchisee fails to pay any amount he is required to pay, or perform any obligation he is required to perform, pursuant to this Agreement, Franchisor may, but will not be obligated to, pay such amount and/or take any action necessary to cure the default. In this event, Franchisee must immediately pay to Franchisor the amount so paid by Franchisor or the amount expended by Franchisor to cure such default, plus interest at the rate of 18% per annum (or, if less, the highest amount permitted by law) from the date paid or expended by Franchisor. This right will accrue whether or not Franchisor terminates this Agreement.

(ii)     If Franchisee abandons or otherwise fails to operate the Franchised Business properly, Franchisor may elect to operate the Franchised Business for a reasonable period on Franchisee's behalf, for a reasonable fee to be determined by Franchisor from time to time.

(v)     Franchisee must participate in all programs of a charitable nature designated by Franchisor from time-to-time, including the obligation to contribute a designated percentage of opening day sales (or sales for other periods) to a charity designated by Franchisor or Franchisee, as Franchisor may elect.

(w)     Franchisee must obtain and maintain continuous access to Franchisor's internet website in a manner that will enable Franchisee to download required information (without regard to size) and to otherwise interact with Franchisor, Franchisee's area developer and other persons, in such manner as Franchisor may specify.

(x)     If Franchisor believes in good faith that any product offered by Franchisee may be unhealthy, unsafe or unsanitary, and Franchisor requests that Franchisee discard such product, Franchisee must do so immediately. In addition, Franchisor may require Franchisee to

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 14 of 74

close the Franchised Business to the public until Franchisor is satisfied that that unhealthy, unsafe or unsanitary condition has been completely corrected.

(y)     Franchisee must upgrade or update the software and programming for his computer system and equipment, and/or the equipment, at Franchisee's expense, when Franchisor believes that it is necessary. Franchisee must obtain an annual support contract with the vendor designated by Franchisor at Southwest Business Systems, at Franchisee's expense.

8.     Service Marks; Proprietary Information.

(a)     For purposes of this Agreement, the term "Service Marks" means (i) the "Cold Stone Creamery & Double-Cone Design" service mark which was registered to SDS Enterprises, Inc., an Arizona corporation Affiliated with Franchisor ("SDS"), with the United States Patent and Trademark Office on the principal register at Reg. No. 1968506, dated April 16, 1996, and which have been assigned to Franchisor by SDS; the "Cold Stone Creamery" service mark which was registered to Franchisor with the United States Patent and Trademark Office on the principal register at Reg. No. 2542783, dated February 26, 2002; and the "Cold Stone Creamery & Single-Cone Design" service marks which were filed by Franchisor with the United States Patent and Trademark Office for registration on the principal register at Serial. Nos. 78/159620, 78/159621, 78/159638, 78/159648, 78/159668, 78/159677 and 78/159684, dated August 30, 2002, (ii) all other trade names, trademarks, service marks, logos, product identifiers, selections and/or designations, including without limitation all registrations and applications for the same, owned by Franchisor or used in connection with the Franchised Business and (iii) the trade dress used in connection with the Franchised Business, including without limitation, the total appearance, atmosphere and image of Cold Stone Creamery® restaurants, the ice cream products and packaging, all related features such as size, texture, shape, color or color combinations, and graphics of Cold Stone Creamery® restaurants and the ice cream products and packaging, and all advertising and marketing techniques used to promote the Franchised Business, as well as specifically including all signage, menu boards, product and ice cream displays, all product configurations such as the appearance of the ice cream and the ice cream additives and/or "mix-ins", the cone configurations, the "Ice-Cream Pull", all product packaging including any containers, buckets or other packages for containing ice cream, and any color schemes and designs utilized in connection with the Cold Stone Creamery® restaurants' interior walls, counters, table tops, chairs, and floors ("Trade Dress"). Use of any Service Marks must be accompanied by the registration, service mark, trademark or other symbol, as designated by Franchisor, in close proximity to the Service Marks. Franchisee must refrain from any business or advertising practice that may be injurious to the business of Franchisor, the goodwill associated with the Service Marks or the Franchised Business.

(b)     Any reproduction of any items or materials suitable for copyright protection by Franchisor (the "Copyrights"), including the copyrightable materials within the Proprietary Information, must bear a copyright notice in the form designated by Franchisor. All advertising and promotional materials generated by or for Franchisee or its officers, managers or employees will be subject to Franchisor's prior approval, will be completely factual and will conform to the highest standards of ethical advertising. Further, all such advertising and promotional materials generated by or for Franchisee or its Principals, officers, managers or employees for the Franchised Business will be deemed a work-made-for-hire, and all ownership rights,

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 15 of 74

including any copyrights, in such advertising and promotional materials are hereby assigned by Franchisee to Franchisor. In addition, Franchisee will require all of its Principals, officers, managers and employees to sign an agreement, in the form of Exhibit D or Exhibit F to the Offering Circular, as the case may be, obligating its Principals, officers, managers and employees to assign all of their rights, title and interest to the Copyrights to Franchisor and requiring its Principals, officers, managers and employees to cooperate in the protecting the Copyrights.

      (c)    During the term of this Agreement, Franchisee and its Principals, officers, managers and employees may conceive, invent, create, design and/or develop various ideas, techniques, methods, processes and procedures, recipes, formulae, products, packaging or other concepts and features relating to store operations, business practices or the manufacturing, production, marketing and sale of ice cream, frozen yogurt, other frozen desserts and related goods in connection with the Franchised Business (the "Innovations"). Franchisee assigns any and all of its rights, title and interest in the Innovations, including any intellectual property rights, to Franchisor, and also agrees to cooperate with Franchisor and its counsel in the protection of the Innovations, including the perfecting of title thereto. In addition, Franchisee will require all of its Principals, officers, managers and employees to sign an agreement, in the form of Exhibit D or Exhibit F to the Offering Circular, as the case may be, obligating its Principals, officers, managers and employees to assign all of their rights, title and interest to the Innovations to Franchisor and requiring its Principals, officers, managers and employees to cooperate in the protecting and perfecting of title in the Innovations for Franchisor.

      (d)    Franchisee will not have the exclusive right to use the Service Marks, the Copyrights, the Innovations or the Proprietary Information. Franchisee may not offer or grant any sublicense or other rights to use the Service Marks, the Copyrights, the Innovations or the Proprietary Information to any person or entity. Franchisee acknowledges and agrees that Franchisor maintains and reserves all rights to the Service Marks the Copyrights, the Innovations and the Proprietary Information except as expressly set forth in this Agreement. Franchisee further acknowledges and agrees that his right to use the Service Marks, the Copyrights, the Innovations and the Proprietary Information is derived solely from this Agreement and that Franchisee will not derive any right, title or interest in the Service Marks, the Copyrights, the Innovations or the Proprietary Information other than a license to use the Service Marks, the Copyrights, the Innovations and the Proprietary Information in connection with the conduct of the Franchised Business during the term of this Agreement. Upon expiration or termination of this Agreement, Franchisee may not, directly or indirectly, use the Service Marks, the Copyrights, the Innovations or the Proprietary Information in any manner or for any purpose whatsoever. Franchisee agrees that he will not in any way infringe upon, harm or contest the rights of Franchisor or any other person or other entity to use of the Service Marks, the Copyrights, the Innovations and the Proprietary Information. Franchisee further acknowledges that his use of the Service Marks, the Copyrights, the Innovations and the Proprietary Information pursuant to this Agreement will inure to the benefit of Franchisor and the Program and that any goodwill arising from Franchisee's use will automatically vest in Franchisor.

      (e)    During the term of this Agreement, Franchisee may not include the name "Cold Stone Creamery" or any substantially similar name in his corporate, partnership, limited

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 16 of 74

liability company or other entity name. However, Franchisee may include the Service Marks in any advertising or marketing materials approved by Franchisor for distribution. Franchisee must use the Service Marks, the Copyrights, the Innovations and the Proprietary Information only in the manner prescribed by Franchisor and in no other manner.

(f)     Franchisee must immediately notify Franchisor of any conduct that could constitute infringement of or challenge to the Service Marks, the Copyrights, the Innovations or the Proprietary Information. Franchisor may, in its sole discretion, decide whether to institute any action in connection with infringement of or challenge to the Service Marks, the Copyrights, the Innovations or the Proprietary Information, and will control all proceedings and litigation. Franchisor is not required to protect Franchisee's right to use the Service Marks, the Copyrights, the Innovations or the Proprietary Information; provided, however, that Franchisor will indemnify Franchisee for, from and against all damages for which Franchisee is held liable in any lawsuit arising out of Franchisee's use of the Service Marks, the Copyrights, the Innovations or the Proprietary Information in compliance with this Agreement.

(g)     Notwithstanding anything contained in this Agreement to the contrary, if it becomes advisable at any time, in Franchisor's sole discretion, to modify or discontinue use of any Service Mark, Copyright, Innovation or Proprietary Information, or use one or more additional or substitute Service Marks, Copyright, Innovation and/or Proprietary Information and/or other information and/or rights, Franchisee must, at his expense, comply within a reasonable time after notice thereof by Franchisor. However, if Franchisor requires Franchisee to modify or discontinue use of any material Service Mark at a time other than upon renewal of the Franchise, and that requirement is a direct result of Material Issues (as defined in the Offering Circular), Franchisor will bear the cost of those modifications or discontinuances. If Franchisor requires Franchisee to modify or discontinue use of any material Copyright, Innovation or Proprietary Information and/or use other information and/or rights in their place at any time other than upon renewal of the Franchise, and that requirement is a direct result of proceedings or litigation that determined that Franchisor's and its franchisees' use of such Copyright, Innovation or Proprietary Information infringed upon a third party's rights, Franchisor will bear the cost of those modifications or discontinuances.

(h)     Franchisee must not solicit other franchisees or area developers, or use the lists of franchisees and area developers, for any commercial or other purpose other than purposes directly related to the operation of their Franchised Businesses without the prior approval of Franchisor. Franchisee will cause its Principals, officers, managers and employees to comply with such restrictions.

(i)     Upon any breach by Franchisee of any of the terms of this Section 8, Franchisor may institute and prosecute proceedings, at law or in equity, in any court of competent jurisdiction, to obtain an injunction to enforce the provisions of this Agreement and to pursue any other remedy to which Franchisor may be entitled. Franchisee agrees that the rights conveyed by this Agreement are of a unique and special nature and that Franchisor's remedy at law for any breach would be inadequate and agrees and consents that temporary or permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this Section 8, without the necessity of posting bond therefor or proof of actual damages.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 17 of 74

9.      **Franchise Fee; Royalties; Advertising Fees; Financing Fee, Development Fee.** In consideration of the grant of the Franchise by Franchisor to Franchisee:

(a)      Franchisee must pay to Franchisor an initial franchise fee (the "Franchise Fee") in the amount of:

(i)      $40,000 if the Franchised Business will be located in the New York Metropolitan Area (as defined below) (or, if Franchisee has previously signed a franchise agreement with respect to another location, $30,000); or

(ii)      $35,000 if the Franchised Business will be located outside of the New York Metropolitan Area (or, if Franchisee has previously signed a franchise agreement with respect to another location, $21,000),

by cashiers or certified check upon the signing of this Agreement by Franchisor and Franchisee. The Franchise Fee will be fully earned by Franchisor upon signing this Agreement and, except as set forth in Section 17(d), will be nonrefundable. For purposes of this Agreement, the term "New York Metropolitan Area" means the following counties: Westchester, NY, Rockland, NY, Kings, NY, New York, NY, Richmond, NY, Bronx, NY, Queens, NY, Nassau, NY, Suffolk, NY, Bergen, NJ, Essex, NJ, Hunterdon, NJ, Middlesex, NJ, Morris, NJ, Passaic, NJ, Somerset, NJ, Sussex, NJ, Union, NJ, Warren, NJ, Hudson, NJ, Fairfield, CT.

(b)      (i)      Franchisee must pay to Franchisor royalties ("Royalties") in an amount equal to 6% of the sales from all products and services sold at the Franchised Business, whether for on-site or off-site consumption ("Gross Sales"). However, Royalties will be increased up to 18% of Gross Sales with respect to any week during which Franchisee is in breach of his obligations under this Agreement. (The Royalties paid or owing to Franchisor with respect to the period during which he is in breach are referred to as "Breaching Royalties.") The term "Gross Sales" also includes the proceeds received or realized by Franchisee in connection with any business interruption insurance maintained by or for the benefit of Franchisee.

(ii)      If Franchisee does not open his Cold Stone Creamery® restaurant to the public within one year after the date of this Agreement or 150 days after Franchisee's landlord makes the site for his Franchised Business available to him, as determined by Franchisor (whichever occurs first), in addition to Franchisor's other rights pursuant to this Agreement, Franchisee must pay royalties ("Late Opening Royalties"), from that date until the date that Franchisee's Cold Stone Creamery® restaurant is open to the public for business or this Agreement has been terminated, at the rate of 6%, calculated based upon Franchisor's Average Unit Volume (as defined below) from time to time. For purposes of this Agreement, the term "Average Unit Volume" means the average annual Gross Sales for Cold Stone Creamery® restaurants, calculated in the same manner as average unit volume is calculated for purposes of Franchisor's then current Franchise Offering Circular (or if the Average Unit Volume is not then disclosed in Franchisor's then current Franchise Offering Circular, calculated in the same manner as the Average Unit Volume was last so disclosed), divided by 52.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 18 of 74

(c)     Franchisee must pay to Franchisor advertising fees ("Advertising Fees") in an amount equal to 3% of Gross Sales. 2% of that amount will be used by Franchisor for national promotional, marketing, public relations and advertising purposes (including, among other things, hiring marketing, public relations and advertising agencies and personnel to assist in developing the Cold Stone Creamery® brand name and average unit volumes, expenses associated with listings in telephone books, subsidies of premiere/marquis Cold Stone Creamery® restaurants designed to garner media attention and promote the Cold Stone Creamery® brand name, travel expenses in connection with promotions and market meetings, training, development of trademarks and trademarked materials, circulars and media advertisements) and 1% of that amount will be used by Franchisor for local promotional, marketing and advertising purposes. Any amounts in the advertising fund not spent during the fiscal year during which they accrued will remain in the advertising fund for use during the next fiscal year; any amounts expended in excess of the amount in the advertising fund during any fiscal year (together with amounts not expended during prior fiscal years) will be debited from the following year's advertising fund.  Franchisor's records relating to the use of Advertising Fees collected from Franchisee will be made available to Franchisee within a reasonable time after Franchisee's request.

(d)     (i)     If Franchisor guarantees Franchisee's lease (or if Franchisor executes Franchisee's lease, instead of having Cold Stone Creamery Leasing Company, Inc. execute it), Franchisee must pay to Franchisor a financing fee ("Financing Fee") in an amount equal to ____% of Gross Sales.

(ii)     If Franchisor leased, built out, acquired permits and/or purchased signage, equipment and/or inventory for Franchisee's Franchised Business prior to signing this Agreement, Franchisee must pay to Franchisor $_____ for the costs and expenses incurred by Franchisor in connection with building out Franchisee's Franchised Business (in lieu of paying such amounts directly to the applicable vendors and other parties) plus a fee in the amount of $_____ (the "Development Fee").

(e)     Royalties, Advertising Fees and the Financing Fee will be due and payable on Friday of each week with respect to Gross Sales during the seven-day period ending on the prior Tuesday (this seven-day period is referred to in this Agreement as a "Business Week"). Royalties, Advertising Fees, the Financing Fee, the Development Fee and any other fees or charges payable to Franchisor or its Affiliates that are not paid within ten days after their due date will bear interest at the rate of 18% per annum. In addition, Royalties, Advertising Fees, Financing Fees Development Fees and any other fees or charges payable to Franchisor or its Affiliates that are not paid within ten days after their due date will be subject to a late charge of five percent (5%) of the unpaid amount, or $100, whichever is greater. Further, the Royalty rate will be increased, as set forth in Section 9(b).

(f)     Franchisee authorizes Franchisor to draw drafts against Franchisee's bank accounts for the full amount of the weekly Royalties, Advertising Fees, the Financing Fee, the Development Fee, the Equipment Fee and for any other amounts that Franchisee owes to Franchisor or its Affiliates or Franchisee's cooperate advertising association (for example, for promotional materials). Simultaneously with signing this Agreement, Franchisee must sign a pre-authorization form, in the form attached as Exhibit E to the Offering Circular, to enable

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 19 of 74

Franchisor to do so. In addition, from time to time at Franchisor's reasonable request, Franchisee must sign those other and further documents as Franchisor may require to enable Franchisor to draw drafts against Franchisee's bank accounts for such purposes.

(g)    If Franchisee fails to submit to Franchisor and his area developer, by 9:00 a.m. (Phoenix, Arizona time) on Friday of each week, an operating statement, in the form specified by Franchisor, which includes Gross Sales figures for the prior Business Week, as required by Section 10(a), the amount drawn against Franchisee's bank account, pursuant to Section 9(e), for the Royalties, Advertising Fees and the Financing Fee with respect to the prior Business Week will be the amount drawn the previous week plus 10%, as an estimate of the prior Business Week's Royalties, Advertising Fees and the Financing Fee, and Franchisee will be assessed a $100 late charge per delinquent operating statement per week, or part thereof (until each delinquent operating statement has been delivered), which amount may be increased by Franchisor from time to time.

(h)    Franchisee must pay to Franchisor an amount equal to any sales, gross receipts or similar taxes assessed against, or payable by, Franchisor and calculated on the Franchise Fee, Royalties, Advertising Fees, the Financing Fee, the Development Fee, the Equipment Fee, equipment and signage purchases or other payments required to be paid pursuant to this Agreement, unless the tax is an income tax or an optional alternative to an income tax otherwise payable by Franchisor. Such amount will be due and payable within 10 days after receipt of Franchisor's invoice.

(i)    If Franchisee fails to deliver or provide to Franchisor and Franchisee's area developer any statement, report or other document or information required to be delivered (for example, certificates of insurance and financial statements), by the applicable deadline, Franchisee will be assessed a $100 late charge per delinquent statement, document or other information per week, or part thereof (until each delinquent statement, document or other information has been delivered or provided), which amount may be increased by Franchisor from time to time.

10.    **Financial Reporting; Evaluations; Audits.**

(a)    (i)    Franchisee must submit to Franchisor and his area developer the weekly reports required by Section 9(f) of this Agreement, and such other periodic reports as Franchisor may require, in the form and manner designated by Franchisor.

(ii)    Franchisee must submit to Franchisor and his area developer, promptly after preparation (but no later than three months after the end of each fiscal year and 30 days after the end of each fiscal quarter), annual and quarterly financial statements (including a balance sheet and an income statement) prepared, in accordance with generally accepted accounting principles, consistently applied, by (and in the case of annual financial statements, reviewed by) Franchisee's independent certified public accountant; provided, however, that if Franchisor is required by law (or otherwise determines it to be necessary or appropriate) to disclose or report Franchisee's financial results of operations (separately or aggregated with other franchisees) to prospective franchisees, such annual financial statements must be audited and submitted to Franchisor within two months after the end of each fiscal year. Franchisee

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 20 of 74

must maintain his books and records in an orderly fashion and in accordance with standard accounting procedures. Franchisee must maintain such books and records as are required by law and such books and records as Franchisor may require, in its sole discretion, including employee timecards.

(b)     Franchisor may inspect, or cause its agents or representatives to inspect, at any time, Franchisee's books and records with respect to the Franchised Business, including Franchisee's federal and state tax returns, sales tax returns, customer records and financial accounts. Franchisee must maintain his books and records with respect to the Franchised Business on the premises of its Franchised Business or such other place as is approved in writing by Franchisor. If Franchisee's books and records are maintained at a place other than on the premises of its Franchised Business, at the request of Franchisor, or its agents or representatives, Franchisee must, by 4:00 p.m. (local time) on the day upon which such request is made, (i) deliver its books and records (and/or accurate and complete copies thereof, at Franchisor's option) to Franchisor, or its agents or representatives, at the Franchised Business or (ii) provide Franchisor, or its agents or representatives, access to Franchisee's books and records (and/or accurate and complete copies thereof, at Franchisor's option) at the place at which they are maintained. Franchisee must assist and cooperate with Franchisor in establishing and maintaining Franchisor's POS system, which provides Franchisor and Franchisee's area developer with independent access to the information and data generated by Franchisee's electronic cash register or computer system, including, at Franchisee's expense, acquiring any necessary hardware or software and setting the system to automatically transmit data and information designated by Franchisor to Franchisor and Franchisee's area developer. All POS data generated by the Franchised Business will be the property of Franchisor.

(c)     Franchisor may audit, or cause its agents or representatives to audit, Franchisee's books and records with respect to the Franchised Business. Franchisee must provide Franchisor and its agents and representatives access to Franchisee's books and records with respect to the Franchised Business, and must cooperate with the conduct of any audit. Franchisor will pay all costs and expenses in connection with any audit unless the audit reveals that Franchisee has underreported his Gross Sales, or underpaid his Royalties, Advertising Fees or Financing Fee, during the audited period. In this event, Franchisee must promptly pay, or reimburse Franchisor for, all costs and expenses in connection with the audit, and must pay Franchisor the amount of the underpayment, plus interest at the rate of 18% per annum on the amount of the underpayment from the respective due date of each underpayment.

(d)     Upon request, Franchisee must, at its expense, promptly provide Franchisor copies of Franchisee's books and records  requested by Franchisor (including Franchisee's charter documents and any agreements among its Principals.)

11.     Guaranty of Franchisee's Obligations.  If Franchisee is a person other than an individual (for example, a corporation, partnership, limited liability company or other entity), Franchisee must deliver to Franchisor, simultaneously with signing this Agreement, a guaranty or guaranties signed by each person (and his or her spouse) or entity owning, directly or indirectly, a five percent (5%) or greater equity interest in Franchisee (for example, the general partners or the shareholders) (collectively, "Principals"), in the form of <u>Exhibit D</u> to the Offering Circular, pursuant to which the Principals agree to perform, and guarantee, Franchisee's

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 21 of 74

obligations to Franchisor and its Affiliates, and agree to be bound by the restrictive covenants and the confidentiality and certain other provisions contained in this Agreement.

12.    **Indemnification.**    Franchisee must protect, defend and indemnify Franchisor, its Affiliates and their respective officers, directors, employees, shareholders, Affiliates, agents, successors and assigns (collectively, the "Indemnified People") and must hold the Indemnified People harmless for, from and against any and all damages, claims, demands, liabilities, losses, costs and expenses (including reasonable attorneys' fees), of every kind and nature, suffered or incurred by any of the Indemnified People in connection with any lawsuit, action, proceeding or claim arising out of Franchisee's actions or omissions or the conduct of the Franchised Business by Franchisee.

13.    **Confidentiality; Restriction on Hiring; Covenant Not to Compete.**

(a)    (i)    Franchisee acknowledges that Franchisor is engaged in a highly competitive business, the success of which is dependent damages, among other things, confidential and proprietary information. Franchisee further acknowledges that Franchisor's method of operation, processes, techniques, formulae and procedures and the other Proprietary Information constitute valuable trade secrets.

(ii)    Franchisee agrees not to use for any purpose, or disclose or reveal (and must cause all of Franchisee's directors, officers and employees not to use for any purpose, or disclose or reveal), during the term of this Agreement or forever thereafter, to any person any contents of Franchisor's Operating Manual, any Proprietary Information or any other information relating to the operation of the Franchised Business. Franchisee must fully and strictly comply with all security measures prescribed by Franchisor for maintaining the confidentiality of all Proprietary Information.

(iii)    Franchisee acknowledges that to breach his or her obligations under this Section 13(a) would cause damage to Franchisor and to Franchisor's other franchisees, and that Franchisee would be liable for this damage.

(iv)    Notwithstanding the foregoing, Franchisee may disclose Proprietary Information to a person who is bound by the terms of this provision regarding confidentiality and a restrictive covenant contemplated by this Section 13, to the extent that that disclosure is necessary in connection with that person's capacity with Franchisee. In addition, notwithstanding the foregoing, Franchisee may use the Proprietary Information as may be necessary in connection with the operation of the Franchised Business.

(v)    Notwithstanding the foregoing, the following will not be subject to the provisions of this paragraph (a):

(a)    Information which is in the public domain as of the date of receipt by Franchisee;

(b)    Information which is known to Franchisee prior to the date of receipt by Franchisee;

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 22 of 74

(c)     Information which becomes known to the public without a breach of the provisions of this Section 13 or any agreement signed in connection with this Agreement; and

(d)     Information which is required by law to be disclosed or revealed, but only strictly to the extent required by law.

(b)     Franchisee may not, during the term of this Agreement and for the one-year period after the expiration or termination of this Agreement for any reason, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), employ, hire or engage as an independent contractor or otherwise any person who is or was (at any time during the term of this Agreement) employed or engaged as an independent contractor or otherwise by Franchisor or any of its Affiliates.

(c)     (i)     Franchisee may not, during the term of this Agreement and for the one-year period after the expiration or termination of this Agreement for any reason, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product within, or for consumption within, a 10-mile radius of any Cold Stone Creamery® restaurant or any location with respect to which a contract has been entered into in connection with the future operation of a Cold Stone Creamery® restaurant.

(ii)     Franchisee may not, during the term of this Agreement and for the one-year period after the expiration or termination of this Agreement for any reason, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product within, or for consumption within, the United States.

(iii)     Franchisee may not, during the term of this Agreement and for the one-year period after the expiration or termination of this Agreement for any reason, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product outside of, or for consumption outside of, the United States.

(iv)     For purposes of this Section 13(c), a business will be deemed to be marketing or selling ice cream, frozen yogurt or another frozen dessert product if more than 15% of its gross sales are derived from the marketing or sale of such products.

(d)     Simultaneously with the signing of this Agreement, Franchisee must cause each of the Principals to sign an agreement in the form of Exhibit D to the Offering Circular, pursuant to which the Principals agree to, among other things, be bound by the terms of this Section 13 and certain other provisions of this Agreement.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 23 of 74

(e)     Franchisee must, promptly upon hiring or taking office obtain from all officers of Franchisee and all managers and employees of the Franchised Business, and must deliver to Franchisor, signed agreements, in the form attached as <u>Exhibit F</u> to the Offering Circular, pursuant to which its officers, managers and employees agree to be bound by the provisions of this Section 13 and certain other provisions of this Agreement; provided, however, that Sections 13(b) and (c) will be effective with respect to officers during the term of their office with Franchisee and for the one-year period thereafter and with respect to managers and employees during the term of their employment or other association with Franchisee and for the six-month period thereafter.

(f)     Franchisee acknowledges that the provisions contained in this Section 13 (including the territorial and time restraints) are reasonable and necessary and agrees that his failure to adhere strictly to the restrictions contained in this Section 13 will cause substantial and irreparable damage to Franchisor and to Franchisor's other franchisees. Upon any breach by Franchisee of any of the terms of this Section 13, Franchisor may institute and prosecute proceedings, at law or in equity, in any court of competent jurisdiction, to obtain an injunction to enforce the provisions of this Agreement and to pursue any other remedy to which Franchisor may be entitled. Franchisee agrees that the rights conveyed by this Agreement are of a unique and special nature and that Franchisor's remedy at law for any breach would be inadequate and agrees and consents that temporary or permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this Section 13, without the necessity of posting bond therefor or proof of actual damages.

(g)     Upon any breach of Section 13(c), Franchisee will, as liquidated damages and not as a penalty, be obligated to pay to Franchisor $35,000 for each site operated in breach of Section 13(c) plus 10% of the sales from all products and services sold by or from a site operated in breach of Section 13(c), whether for on-site or off-site consumption.

(h)     If the scope of any restriction contained in this Section 13 is too broad to permit the enforcement of that restriction to its fullest extent, then that restriction will be enforced to the maximum extent permitted by law, and Franchisor and Franchisee each consents and agrees that the scope may be judicially limited or modified accordingly in any proceeding brought to enforce that restriction. Each provision contained in this Section 13 is independent and severable and, to the extent that any provision is declared by a court of competent jurisdiction to be illegal, invalid or unenforceable, that declaration will not affect the legality, validity or enforceability of any other provision contained in this Agreement or the legality, validity or enforceability of that provision in any other jurisdiction.

14.     Transfer of the Franchised Business; Assignment of Franchise Rights.

(a)     Franchisee may not offer or grant any subfranchise of the Franchise, or sell or otherwise transfer any equipment or other assets used in connection with the Franchised Business (other than in the ordinary course of Franchisee's business), without the express written consent of Franchisor, which consent may be withheld by Franchisor, in its sole discretion.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 24 of 74

(b)     Franchisee may not sell or otherwise transfer, by operation of law or otherwise, the Franchise or the Franchised Business, or assign any right granted under this Agreement, without the prior written consent of Franchisor, which consent not be unreasonably withheld. It is agreed that Franchisor's withholding of consent (i) because the prospective transferee (the "Transferee") would not satisfy the then-current qualifications for franchisees, (ii) because the financial or other terms of the transfer may have an adverse impact upon the Transferee's operation of the Franchised Business or (iii) at a time when Franchisee (or his Principals, officers, managers or employees) is in breach of, or default under, this Agreement or any other agreement with Franchisor or its Affiliates is reasonable. Any transfer of an equity interest in Franchisee, by operation of law or otherwise, and any merger or consolidation of Franchisee (if a corporation, partnership, limited liability company or other entity) will be deemed to be a transfer of the Franchised Business in violation of this Section 14.

(c)     If Franchisee desires to sell or otherwise transfer the Franchise or the Franchised Business, or assign any right granted under this Agreement, he must provide Franchisor with a written request for a transfer, which request must be accompanied by financial and other information regarding the Transferee as Franchisor may require, all pertinent terms of the transaction (which transaction must be for cash and no other consideration) and the Transfer Fee (as defined below) (all of that information and the Transfer Deposit are collectively referred to as the "Required Materials"). For purposes of this Agreement, the term "Transfer Fee" means the greater of:

(i)     Five percent (5%) of the gross sales price and other consideration to be received or realized by Franchisee and his Affiliates in connection with the transfer and

(ii)     $10,000 if the Franchised Business is not located in California or Hawaii or the New York Metropolitan Area, and $20,000, if the Franchised Business is located in California, Hawaii or the New York metropolitan area,

payable in cash or by cashiers or certified check. Franchisor may, but will not be obligated to, contact or meet with the Transferee. The Transfer Fee will be deemed to have been earned by Franchisor, and be non-refundable, upon Franchisor's approval of the transfer.

(d)     Within 30 days after Franchisor's receipt of all of the Required Materials, Franchisor will notify Franchisee that (i) Franchisor desires to purchase the Franchised Business and Franchisee's rights under this Agreement, upon the same terms and conditions as are offered by the Transferee, (ii) the transfer is approved or (iii) the transfer is disapproved, at Franchisor's election. If the transferee is disapproved, 75% of the Transfer Fee, less all our-of-pocket expenses incurred by Franchisor relating to the proposed transfer, will be refunded to Franchisee.

(e)     If Franchisor notifies Franchisee that it desires to purchase the Franchised Business and Franchisee's rights under this Agreement, that transaction will be consummated, upon the same terms and conditions as are offered by the Transferee, but not later than 60 days after the end of the 30-day period referred to above.

(f)     If Franchisor notifies Franchisee that the transfer is approved, Franchisee may transfer the Franchised Business, within 60 days after the end of the 30-day period referred to

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 25 of 74

above, to the Transferee on terms no less favorable to Franchisee than the terms set forth in the Required Materials, provided that prior to the closing of the transfer of the Franchised Business:

(i) The Transferee signs the form of franchise agreement then being signed by new franchisees and the other documents attached to that franchise agreement have been signed; provided, however, that the term of the franchise will be the period remaining under this Agreement and that no initial franchise fee must be paid;

(ii) Each person (and his or her spouse) or entity owning, directly or indirectly, a five percent (5%) or greater equity interest in the Transferee (for example, the general partners or the shareholders) signs an agreement in the form of an exhibit to the form of franchise agreement then being signed by new franchisees, pursuant to which he agrees to perform, and guarantee, the Transferee's obligations to Franchisor, and agrees to be bound by the confidentiality provisions and restrictive covenants contained in the form of franchise agreement then being signed by new franchisees;

(iii) The Transferee signs a confidentiality agreement in the form required by Franchisor and attends and satisfactorily completes the Training Program, in the sole discretion of Franchisor, if required by Franchisor;

(iv) Franchisee signs and delivers to Franchisor a general release of Franchisor and its Affiliates, in the form that Franchisor may require;

(ii) Franchisee, at his expense, remodels and updates the Franchised Business to Franchisor's then current standards;

(iii) Franchisee pays the Transfer Fee, by cashiers' or certified check, to Franchisor; and

(vi) All amounts outstanding by Franchisee to Franchisor as of the date of the closing are paid at the closing, and all breaches of or defaults under this Agreement or any other agreement with Franchisor or its Affiliates are cured as of the closing.

Despite Franchisor's approval and the transfer of the Franchised Business, Franchisee and the Principals will be secondarily liable for the Transferee's performance of the Transferee's obligations under its franchise agreement; provided, however, that neither Franchisee nor the Principals will be secondarily liable for the Transferee's performance of the Transferee's obligations under its franchise agreement beyond the Deadline (as defined below). For purposes of this Agreement, the term "Deadline" means the later of (i) the end of the franchise term in progress at the time of the transfer (either the Initial Term or the renewal term) and (ii) if less than five (5) years remain outstanding in the franchise term in progress at the time of the transfer, five (5) years from the date of the transfer. Neither this Agreement or the franchise agreement signed by the Transferee, nor any of the rights conferred under this Agreement or the franchise agreement signed by the Transferee, may be retained by Franchisee as security for the payment of the Transferee's obligations to Franchisee.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 26 of 74

(g) Any transfer of the Franchised Business to a corporation, partnership, limited liability company or other entity that is majority-owned by Franchisee will be subject to the other provisions of this Section 14; provided, however, there will be no transfer fee and Franchisor will not have the right of first refusal contemplated by Section 14(e). In connection with this transfer, however, the transferee will not be entitled to attend the Training Program, the franchised entity must sign the form of franchise agreement then being signed by new franchisees (and will be subject to the terms of that franchise agreement, except that the term will be the transferor's remaining term and that no initial franchise fee must be paid) and each person (and his or her spouse), corporation, partnership, limited liability company or other entity that owns, directly or indirectly, a five percent (5%) or greater equity interest in the franchised entity must sign and deliver to Franchisor an agreement, in the form attached to the franchise agreement then being signed by new franchisees, pursuant to which he, she or it agree to perform, and guarantee, the transferee's obligations to Franchisor and its Affiliates, and agree to be bound by the restrictive covenants and the confidentiality and certain other provisions contained in the franchise agreement then being signed by new franchisees.

(h) In the case of an individual Franchisee, any attempt to transfer the Franchised Business or assign any right granted under this Agreement upon Franchisee's death, disability or dissolution of marriage (if the Franchised Business, or a majority interest therein, will be transferred to Franchisee's spouse upon dissolution of marriage) will be subject to the restrictions on transfer contained in this Section 14; provided, however, that Franchisor will not have the right of first refusal contemplated by Section 14(e). However, if Franchisor does not approve the proposed transferee upon death, disability or dissolution of marriage, Franchisee or his/her legal representative must, within 90 days after Franchisee's death, disability or dissolution of marriage, transfer the Franchised Business to a person or entity approved by Franchisor in accordance with the provisions of this Section 14 within this 90-day period, this Agreement will terminate.

15. Term; Renewal.

(a) Subject to Section 16 of this Agreement, the term of this Agreement will commence on the date first set forth above and will continue until the end of the Probationary Period. This Agreement will automatically be extended through the date that is ten years after the date of this Agreement (the "Initial Term"), unless Franchisor provides to Franchisee prior to the end of the Probationary Period written notice that this Agreement will expire as of the end of the Probationary Period. (However, if Franchisee executed this Agreement in connection with a transfer of the Franchised Business, the Initial Term will continue until the date that the transferring franchisee's franchise agreement would have expired.) For purposes of this Agreement, the term "Probationary Period" will mean the period beginning on the date of this Agreement and ending on the date on which Franchisor notifies Franchisee in writing that Franchisor believes in good faith that Franchisee (i) may not be a good fit within the Cold Stone Creamery® system or (ii) may adversely affect the goodwill or reputation of Franchisor, its products or the Service Marks, but not later than the date on which Franchisee's Franchised Business opens to the public for business.

(b) If this Agreement has not expired or been terminated prior to the end of the Initial Term, then Franchisee may renew the Franchise for four (4) consecutive five (5)-year

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 27 of 74

terms (or such lesser number as are remaining under Franchisee's transferor's franchise agreement) commencing upon the expiration of the initial term, provided that:

(i)     At the time of each renewal, Franchisee (and his Principals, officers, managers and employees) must not be in breach of his (or their) obligations under, or related to, this Agreement (including the Events of Default) or any other agreement with Franchisor or its Affiliates;

(ii)     Franchisee must notify Franchisor in writing of his intention to renew at least one year (but not more than 18 months) before the end of each then current term (initial or renewal), which notice must be accompanied by a renewal fee equal to one-third (1/3) of the then-current initial franchise fee, payable by cashiers' or certified check; provided, however that the renewal fee will not exceed the amount of the Franchise Fee in this Agreement.

(iii)     Prior to each renewal, Franchisee must, at his expense, remodel and update the Franchised Business to Franchisor's then current standards;

(iv)     Prior to each renewal, Franchisee must sign the form of franchise agreement then being signed by new franchisees and will be subject to the terms of that franchise agreement (including the Royalties, Advertising Fees, the Financing Fee and other charges) other than the franchise term;

(v)     Prior to each renewal, Franchisee must sign a general release of Franchisor and its Affiliates, in the form that Franchisor may require;

(vi)     Prior to each renewal, Franchisee must, at his expense, attend such training programs or refresher courses as Franchisor may request; and

(vii)     Franchisor has not notified Franchisee in writing that Franchisor objects to the renewal and returns the renewal fee to Franchisee.

If any of the above requirements have not been satisfied, the Franchise will not be renewed and will expire at the end of the then-current term. The parties agree that Franchisor's refusal to renew if any of the above requirements has not been satisfied constitutes "good cause."

16.     **Termination.** This Agreement may be terminated by Franchisor, at its option, upon the occurrence of any of the following events ("Events of Default"), which are deemed to be terminations for "good cause:"

(a)     If Franchisee (or his Principals) fails to pay any monies owed to Franchisor or any of its Affiliates under this Agreement, or any other agreement with Franchisor or its Affiliates, and that failure has not been cured within 30 days after Franchisor has provided notice of that failure to Franchisee. Termination will be effective immediately upon the expiration of the end of that cure period.

(b)     If Franchisee (or his Principals, officers, managers or employees) fails to perform any obligation (other than the payment of monies owed to Franchisor or any of its Affiliates)

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 28 of 74

under this Agreement, or any other agreement with Franchisor or its Affiliates; provided, however, that if that failure is curable (in Franchisor's discretion), Franchisee may cure that failure within 30 days after Franchisor has provided notice of that failure to Franchisee. Termination will be effective immediately upon notice, unless that failure is curable, in which event, termination will be effective upon the 30th day after that notice, unless that failure is cured.

(c) If Franchisee (or his Principals, officers, managers or employees) repeatedly (three or more times) fails to pay any monies owed to Franchisor or any of its Affiliates or perform any obligation (either one obligation three times, three obligations one time each or any such combination) under this Agreement, or any other agreement with Franchisor or its Affiliates. Termination will be effective immediately upon written notice to Franchisee.

(d) If Franchisee loses possession of the restaurant premises or site for any reason during the term of this Agreement. Termination will be effective upon either of the following, at Franchisor's election:

(i) The date possession of the premises or site is lost or

(ii) The date 30 days after Franchisor has provided notice of termination to Franchisee, unless Franchisee has regained possession of the restaurant premises within 30 days after Franchisor has provided notice of termination to Franchisee.

(e) If Franchisee breaches or defaults under any obligation under the lease or Sublease of the restaurant premises or site, and that breach or default has not been cured within the time allowed by the lease or Sublease for Franchisee to cure. Termination will be effective upon either of the following, at Franchisor's election:

(i) The termination of that lease or Sublease or

(ii) The date 30 days after Franchisor has provided notice of termination to Franchisee, unless Franchisee has cured that breach or default within 30 days after Franchisor has provided notice of termination to Franchisee.

(f) If Franchisee loses, or fails to obtain or maintain, any permit or license necessary to operate the Franchised Business. Termination will be effective upon either of the following, at Franchisor's election:

(i) The date that that permit or license is lost or denied or

(ii) The date 30 days after Franchisor has provided notice of termination to Franchisee, unless Franchisee has obtained or regained that permit or license within 30 days after Franchisor has provided notice of termination to Franchisee.

(g) If Franchisee underreports his Gross Sales by two percent or more during any calendar year. Termination will be effective immediately upon notice of termination to Franchisee.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 29 of 74

(h)     If Franchisee files a petition for bankruptcy or is placed in involuntary bankruptcy. Termination will be effective immediately upon that filing or placement.

(i)     If any of the Principals files a petition for bankruptcy or is placed in involuntary bankruptcy. Termination will be effective immediately upon that filing or placement.

(j)     If any involuntary lien exceeding $10,000 is placed on Franchisee's business assets and is not promptly (but in any event within 30 days) removed or bonded against. Termination will be effective immediately upon notice to Franchisee by Franchisor.

(k)     If Franchisee conducts the Franchised Business in a manner that may adversely affect the goodwill or reputation of Franchisor, its products or the Service Marks; provided, however, that if, in Franchisor's sole discretion, that damage is curable, Franchisee will have 30 days within which to cure that damage. Termination will be effective immediately upon notice, unless that damage is curable, in which event, termination will be effective upon the 30th day after that notice, unless that damage is cured.

(l)     If Franchisee does not open the Franchised Business within one year after the date of this Agreement or 150 days after Franchisee's landlord makes the site for his Franchised Business available to him, as determined by Franchisor, whichever occurs first. Termination will be effective on such date or on such later date as Franchisor may select.

(m)    If Franchisee attempts to transfer, or transfers, by operation of law or otherwise, the Franchised Business, or attempts to assign, or assigns, any right granted under this Agreement, without the prior written consent of Franchisor, or otherwise in violation of this Agreement. Any transfer of an equity interest in Franchisee, by operation of law or otherwise, and any merger or consolidation of Franchisee (if a corporation, partnership, limited liability company or other entity) is deemed to be a transfer in violation of this provision. Termination will be effective upon either of the following, at Franchisor's election:

(i)     The date of the attempted transfer, transfer, attempted assignment, assignment, merger or consolidation or

(ii)    The date 30 days after Franchisor has provided notice of termination to Franchisee, unless the transfer or assignment has been rescinded within 30 days after Franchisor has provided notice of termination to Franchisee.

(n)     If the Franchised Business is not transferred within the 90-day period referenced in Section 14(h) of this Agreement.

(o)     If Franchisee (or, if Franchisee is a corporation, partnership, limited liability company or other entity, a Principal) fails to satisfactorily complete the Training Program, in the sole discretion of Franchisor, a second time or refuses to attend the Training Program a second time.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 30 of 74

(p)     If any other franchise agreement, any area developer agreement or any other agreement between Franchisor or any of its Affiliates and Franchisee or any of his Affiliates is terminated.

(q)     If, at any time after:

(i)     Franchisee has received notice of termination of this Agreement, with or without the passage of a cure or notice period;

(ii)     Franchisor has exercised its right of first refusal in connection with a transfer of the Franchise or the Franchised Business, or the assignment of any right granted under this Agreement; or

(iii)     Franchisor has disapproved a requested transfer, or withheld its consent in connection with a requested transfer, of the Franchise or the Franchised Business, or the assignment of any right granted under this Agreement,

Franchisee conducts the Franchised Business in a manner that may adversely affect the goodwill or reputation of Franchisor, its products or the Service Marks, damages the premises or any equipment in connection with the Franchised Business or otherwise breaches his obligations under this Agreement. Termination will be effective immediately upon notice. Pursuant to this Section 16(q), Franchisee will not have any right to cure a breach pursuant to any other provision of this Agreement, as Franchisor's right to terminate pursuant to this Section 16(q) supersedes any other provision of this Agreement.

(r)     If Franchisee misrepresents, or commits fraud in connection with, any information contained in his application for a franchise, or in any other oral or written information communicated to Franchisor.

(s)     If Franchisee ceases to operate or otherwise abandons the Franchised Business, as evidenced by the Franchised Business being closed for business for more than three consecutive days.

(t)     If Franchisee violates any health, safety or sanitation law, rule, regulation or ordinance and fails to begin to correct such noncompliance or violation immediately and fails to completely correct such noncompliance or violation within 72 hours after Franchisor has provided notice of such noncompliance or violation to Franchisee.

(u)     If Franchisee or any Principal is (or has been) convicted by a trial court of, or has plead guilty or no contest to, a felony or other crime or offense that may adversely affect the goodwill or reputation of Franchisor, its products or the Service Marks, or if Franchisee or any Principal engages in (or has engaged in) any conduct that may adversely affect the goodwill or reputation of Franchisor, its products or the Service Marks.

(v)     If Franchisee or any Principal engages in any conduct that violates any law, regulation or ordinance or commits an act of moral turpitude.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 31 of 74

17.    Rights and Obligations of the Parties upon Expiration or Termination.

(a)    Upon expiration or termination of this Agreement for any reason:

(i)    Franchisee will forfeit all fees paid.

(ii)    All goodwill associated with Franchisee's Franchised Business, and Franchisee's use of the Service Marks, is, and will be, the property of Franchisor, and Franchisee will receive no payment therefor.

(iii)    Franchisee must promptly return to Franchisor Franchisor's Operating Manual, all training materials, all recipes and all other property of Franchisor (including all materials relating to the Service Marks, the Copyrights, the Innovations or the Proprietary Information).

(iv)    Franchisor may enter the premises of the Franchised Business and recover Franchisor's Operating Manual, all training materials, all recipes and all other property of Franchisor (including all materials relating to the Service Marks, the Copyrights, the Innovations or the Proprietary Information).

(v)    Franchisee must immediately (a) cease using the Service Marks, the Copyrights, the Innovations and the Proprietary Information, (b) cancel all assumed names or equivalent business registrations relating to the use of the Service Marks, (c) notify the telephone company and all listing agencies of the termination of Franchisee's right to use the Service Marks and, if requested by Franchisor, of Franchisee's assignment of Franchisee's telephone numbers to Franchisor, (d) not, directly, or indirectly, identify himself with Franchisor or the Service Marks and (e) if requested by Franchisor, renovate the premises of the Franchised Business to eliminate the Service Marks and de-identify such premises to remove all Trade Dress (including the "cold stone"), returning it to a "vanilla shell," at Franchisee's expense. Franchisee irrevocably appoints and constitutes Franchisor and its designated agents, with full power of substitution, as Franchisee's agent and attorney-in-fact for and on behalf of, and in Franchisee's name, and at Franchisee's expense, to take any or all of the above actions, without liability for trespass. This special power of attorney will be deemed to be coupled with an interest and irrevocable.

(vi)    Franchisee must pay to Franchisor, within ten days of expiration or termination of this Agreement, all amounts outstanding to Franchisor or its Affiliates from Franchisee or his Affiliates.

(b)    In addition, upon expiration or termination of this Agreement by Franchisor or by Franchisee, Franchisor may, but will not be obligated to, purchase, or have its designee purchase:

(i)    All, or any portion of, Franchisee's signage and menu boards; and/or

(ii)    All, or any portion of, the restaurant equipment and other tangible assets of the Franchised Business

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 32 of 74

for an amount equal to the Value (as defined below). Franchisor, or its designee, may, but will not be obligated to, assume Franchisee's future obligations under Franchisee's premises lease or Sublease and continue the operations of Franchisee's Franchised Business in Franchisor's, or its designee's, name. If Franchisor is required, by law, regulation or court order, to purchase the equipment and/or other tangible assets used in connection with the Franchised Business, the purchase price will be equal to the Value. For purposes of this Agreement, the term "Value" means, subject to applicable law, an amount equal to Franchisee's cost for such assets, less depreciation and amortization using a 200% declining balance method over a 5-year period.

(c)     Upon any breach by Franchisee of any of the terms of this Section 17, Franchisor may institute and prosecute proceedings, at law or in equity, in any court of competent jurisdiction, to obtain an injunction to enforce the provisions of this Agreement and to pursue any other remedy to which Franchisor may be entitled. Franchisee agrees that the rights conveyed by this Agreement are of a unique and special nature and that Franchisor's remedy at law for any breach would be inadequate and agrees and consents that temporary or permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this Section 17, without the necessity of posting bond therefor or proof of actual damages.

(d) Notwithstanding the foregoing, if this Agreement expires at the end of the Probationary Period, the Sublease will be terminated as of that date. In connection with the expiration, Franchisor will refund the Franchise Fee to Franchisee and will purchase the equipment, signage and fixtures purchased by Franchisee in connection with the establishment of his Franchised Business in accordance with Franchisor's standards and specifications for an amount equal to:

(i)     Franchisee's actual out-of-pocket direct costs paid or incurred by Franchisee with respect to that equipment, signage and fixtures (the "Equipment Costs"); plus

(ii)     Franchisee's actual out-of-pocket direct costs paid or incurred by Franchisee with respect to the build-out of the premises of his Franchised Business (the Build-out Costs"); plus

(iii)     An amount equal to the interest (calculated at the prime rate, as published by the West Coast edition of The Wall Street Journal as of the end of the Probationary Period, plus 250 basis points) that would have accrued on the Equipment Costs and the Build-out Costs, beginning, in the case of each item, on the date that such item was paid for by Franchisee and ending on the date on which the Probationary Period ends.

For purposes of this Section 17(d), the Equipment Costs and the Build-out Costs will include only direct costs and will exclude indirect costs, such as administrative expenses, legal expenses and other items that will not be utilized on the premises of Franchisee's Franchised Business.

18.     **Survival.** Notwithstanding anything contained in this Agreement to the contrary, the provisions of this Agreement which may affect the parties' rights and obligations after the

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 33 of 74

expiration or termination of this Agreement will survive the expiration and termination of this Agreement.

19.    Relationship of the Parties.

(a)    Franchisee must not represent or imply that the Franchised Business conducted by Franchisee is owned by Franchisor. Upon the request of Franchisor, Franchisee must post a sign in the Franchised Business stating that Franchisee is an independent contractor and that the Franchised Business is not owned or operated by Franchisor. Franchisee will be an independent contractor, and nothing contained in this Agreement will be construed to create or imply a fiduciary relationship between the parties, nor to make either party a general or specific agent, legal representative, employee, joint venturer, partner or servant of the other. Franchisee is in no way authorized to sign any contract or agreement, to make any representation or warranty or to create any obligation (express or implied) on behalf of Franchisor. Franchisee will be responsible for his own taxes (including any taxes levied upon the Franchised Business with respect to compensation or otherwise).

(b)    The parties understand and agree that Franchisee's area developer is in no way authorized to sign any contract or agreement, to make any representation or warranty or to create any obligation (express or implied) on behalf of Franchisor.

20.    **Provisions.** Each provision, condition and term of this Agreement is material, and a breach or violation of any of them will constitute a default of that party's obligations under this Agreement.

21.    **Affiliates.** For purposes of this Agreement, the term "Affiliate" means any person or entity controlling, controlled by or under common control with another person or entity.

22.    **Notices.** All communications or notices required or permitted to be given or served under this Agreement must be in writing and will be deemed to have been duly given or made if (a) delivered in person or by courier (including by Federal Express or other courier), (b) deposited in the United States mail, postage prepaid, for mailing by certified or registered mail, return receipt requested, or (c) faxed, and addressed to the address or fax number set forth in this Agreement. All communications and notices will be effective upon delivery in person or by courier to the address set forth in this Agreement, upon being deposited in the United States mail in the manner set forth above or upon being faxed in the manner set forth above. Any party may change his, her or its address or fax number by giving notice in writing, stating his, her or its new address, to the other party to this Agreement as provided in the foregoing manner.

23.    **Successors and Assigns.** Subject to Section 14, which restricts Franchisee's rights to assign this Agreement and his rights hereunder, this Agreement will be binding upon and inure to the benefit of the parties and their respective assigns, legal representatives, executors, heirs and successors. Any attempt by Franchisee to assign this Agreement, or any of his rights hereunder, or to delegate his obligations hereunder, without compliance with the terms of Section 14 will be void. Notwithstanding anything contained in this Agreement to the contrary,

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 34 of 74

Franchisor may assign this Agreement, or any of its rights hereunder, or delegate any of its obligations hereunder without the consent of Franchisee or any other person.

24.    Amendment, Modification, Waiver or Deferral.

(a)    Notwithstanding anything contained in this Agreement to the contrary, if Franchisee or any of his Affiliates signs a franchise agreement with Franchisor or any of his Affiliates after the date of this Agreement, the terms of this Agreement and any previously signed franchise agreement (and/or the documents signed in connection with this Agreement and any previously signed franchise agreement) (as this Agreement and any previously signed franchise agreement, and/or such other documents may be or have been amended) will be automatically amended to be identical to the terms of that subsequent franchise agreement (and/or the documents signed in connection with that subsequent franchise agreement); provided, however, that the term of the franchise will be the period remaining under this Agreement (or previously signed franchise agreements, as the case may be). In addition, the terms of this Agreement (and the terms of the documents signed in connection with this Agreement) will automatically amend the terms of franchise agreements (and those other documents) previously signed by Franchisee or any of his Affiliates (as such franchise agreements and those other documents have previously been amended) to the effect that such previously signed franchise agreements (and those other documents) are identical to the terms of this Agreement (and the other documents signed in connection with this Agreement); provided, however, that the term of the previously signed franchise agreements will be the period remaining under those franchise agreements.

(b)    Notwithstanding anything contained in this Agreement to the contrary, if Franchisor from time to time changes any fee payable in connection with this Agreement (including Royalties, Advertising Fees, the Financing Fee, the Development Fee, the Equipment Fee, Transfer Fees and consulting fees), the terms of this Agreement (and/or the other documents signed in connection with this Agreement) will be automatically amended to be reflect the change in any such fee, and Franchisee will be subject to such fees, as amended.

(c)    Notwithstanding anything contained in this Agreement to the contrary, Franchisor retains the right to modify and amend Franchisor's Operating Manual and to issue rules, regulations, instructions, policies and procedures for the conduct of the Franchised Business from time to time, in its sole discretion, without obtaining the consent or approval of Franchisee.

(d)    Except as set forth in this Agreement, no amendment, modification or waiver of any condition, provision or term of this Agreement will be valid or of any effect unless made in writing, signed by the parties and specifying with particularity the nature and extent of the amendment, modification or waiver.

(e)    Failure on the part of any party to complain of any act or failure to act of another party or to declare another party in default, irrespective of how long the failure continues, will not constitute a waiver by that party of his, her or its rights under this Agreement; provided, however, that any breach or default of Franchisor will be deemed to be waived 90 days after the occurrence of this breach or default unless Franchisee provides written notice of this breach or

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 35 of 74

default to Franchisor within this 90-day period. Any waiver by any party of any default of another party will not affect or impair any right arising from any other or subsequent default.

(f) Notwithstanding anything contained in this Agreement to the contrary, at any time that Franchisee or any of his Affiliates is in breach of his obligations under this Agreement, or any other agreement between Franchisee or any of his Affiliates and Franchisor or any of its Affiliates, Franchisor (or its Affiliate) may elect to defer the performance of Franchisor's (or its Affiliate's) obligations under this Agreement or such other agreement, or defer the opening of Franchisee's Franchised Business, until Franchisee's (or its affiliate's) breach has been cured. Franchisor's (or its Affiliate's) exercise of that right will not constitute a waiver of its rights under this Agreement or such other agreement, including Franchisor's (or its Affiliate's) right to terminate this Agreement or such other agreement. In addition, Franchisor's (or its Affiliate') exercise of that right will not serve as a basis for any claim by Franchisee (or his Affiliate) that Franchisor did not perform its obligations in a timely manner.

25.    **Severable Provisions; Enforceability.** Each and every provision of this Agreement is intended to be independent of and severable from the others. If any provision of this Agreement is declared by a court of competent jurisdiction to be illegal, unenforceable or invalid for any reason whatsoever, that illegality, unenforceability or invalidity will not affect the validity of the remainder of this Agreement or the legality, enforceability or validity of that provision in any other jurisdiction. It is the intention and the agreement of the parties to this Agreement that the noncompetition and confidential information provisions set forth in Section 13 of this Agreement be enforceable to the maximum extent permitted by law and, to that end, understand and agree that said provisions may be limited or modified by a court of competent jurisdiction to ensure enforceability thereof.

26.    **Entire Agreement.** This Agreement, including the exhibits and Franchisor's Operating Manual, contains the entire understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings between the parties with respect to that subject matter. Each of the exhibits and Franchisor's Operating Manual are incorporated in this Agreement by this reference and constitute a part of this Agreement. Notwithstanding the foregoing, if this Agreement is being signed in accordance with a Multi-unit Agreement signed by Franchisor and Franchisee (or its Affiliates), the deadline for opening the Franchised Business set forth in the Multi-unit Agreement will supersede the deadline set forth in this Agreement.

27.    **Terminology.** All references in this Agreement to the term "including" means "including, without limitation." All captions, headings or titles in the paragraphs or sections of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement or a limitation of the scope of the particular paragraph or section to which they apply. All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, will, where appropriate, include all other genders and the singular will include the plural and vice versa.

28.    **Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be considered one and the same agreement and will become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 36 of 74

29.	Arizona Law to Govern; Jurisdiction; Right to Jury Trial Waived; Certain Damages Waived.

(a)	This Agreement will be governed by, and construed and enforced in accordance with, the law of Arizona, regardless of any conflict-of-law provisions to the contrary.

(b)	Each party agrees that any litigation between the parties will be commenced and maintained only in the courts located in Maricopa County, Arizona, and each party consents to the jurisdiction of those courts.

(c)	Franchisee hereby waives the right to a jury trial and waives the right to seek or collect punitive, consequential and special damages.

(d)	Franchisee hereby waives the right to any damages in connection with or resulting from the wrongful issuance of an injunction. In addition, the parties agree that the maximum damages that Franchisee may recover in connection with a wrongful termination of his franchise and this Agreement (unless such termination was in bad faith) will be an amount equal to the product of:

(i)	The Annual Revenue (as defined below) multiplied by

(ii)	The lesser of:

(x)	The number of full years existing between the date on which the franchise and this Agreement were wrongfully terminated and the date on which the initial term of this Agreement would have otherwise expired (or, if the initial term has expired, the date on which the then-current renewal term would have otherwise expired); or

(y)	Three;

provided, however, that if Franchisee's Franchised Business had not, prior to such wrongful termination, been opened for business to the public for at least one month, then the maximum damages that Franchisee may recover in connection with a wrongful termination of his franchise and this Agreement (unless such termination was in bad faith) will be an amount equal to the direct out-of-pocket costs actually paid by Franchisee prior to such termination in connection with (x) the purchase of his furniture, fixtures and equipment for the Franchised Business and (y) the build-out of the premises in which Franchisee's Franchised Business would have been conducted. For purposes of this Agreement, the term "Annual Revenue" means an amount equal to the net profits of Franchisee's Franchised Business, as reflected on Franchisee's tax return filed with the Internal Revenue Service prior to such termination; provided, however, that if such tax return reflects the operations of Franchisee's Franchised Business for a period less than one year, such net profits will be annualized based upon the net profits reflected in such tax return.

30.	Arbitration. If any controversy or dispute arises between the parties related in any way to this Agreement or the relationship between the parties (including, without limitation, the

performance, interpretation or application thereof), the controversy or dispute will be settled by binding arbitration, except for controversies or disputes where provisional or injunctive relief is sought (as provided in this Agreement). To initiate a proceeding, either party must serve upon the other a written notice stating that that party desires to have the controversy reviewed by an arbitrator and designating an arbitrator, who must be an attorney having substantial experience in business or business transactions. If the other party objects to the first party's selection of an arbitrator and the parties cannot mutually agree upon the selection of an arbitrator within 30 days after service of the first party's written notice, the arbitrator, who must be an attorney having substantial experience in business or business transactions will be selected by the American Arbitration Association upon the written request of either party. Arbitration will be conducted in Phoenix, Arizona in accordance with the rules then in force of the American Arbitration Association, and the decision and award of the arbitrator will be binding upon both parties and may be entered in a court of competent jurisdiction. At the request of either party, the arbitration proceedings will be conducted in secrecy. If arbitration has been commenced prior to the requesting party's receipt of notice of termination of this Agreement, all provisions of this Agreement will remain in full force and effect during the period of any arbitration, with each party continuing to perform his, her or its obligations under this Agreement timely and in good faith. The costs and expenses of arbitration will be paid by the non-prevailing party or, if neither party is determined by the arbitrator(s) to be the prevailing party, each party will pay his, her or its own costs and expenses of arbitration plus 50% of the common costs and expenses (including the arbitrator(s)' fee).

**31.** **Attorneys' Fees.** In the event of any claim, controversy or dispute arising out of or relating to this Agreement, or the breach thereof, the prevailing party may recover reasonable attorneys' fees incurred in connection with any court or arbitration proceeding.

**32.** **Remedies Cumulative.** The remedies of the parties under this Agreement are cumulative and will not exclude any other remedies to which any party may be lawfully entitled.

**33.** **Construction.** The parties acknowledge that each party was represented (or had the opportunity to be represented) by legal counsel in connection with this Agreement and that each of them and his, her or its counsel have reviewed this Agreement, or have had an opportunity to do so, and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement or any amendments or any exhibits hereto or thereto.

**34.** **Additional Actions.** Each party agrees to do all acts and things and to make, execute and deliver such written instruments as may from time to time be reasonably required to carry out the terms and provisions of this Agreement.

**35.** **Computation of Time.** Whenever the last day for the exercise of any privilege or discharge of any duty under this Agreement falls upon Saturday, Sunday or any legal holiday under Arizona law, the party having that privilege or duty will have until 5:00 p.m. Phoenix, Arizona time, on the next succeeding regular business day to exercise that privilege or to discharge that duty.

**36.** **Currency.** Unless otherwise directed by Franchisor in writing, all amounts contemplated by this Agreement will be paid in United States Dollars and deposited in the bank

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 38 of 74

account specified by the recipient. Computation of any amounts to be paid which require conversion between currencies will be made at the selling rate for United States Dollars quoted by Franchisor's primary bank on the date on which payment is made. Franchisee will pay all costs of currency exchange.

37.     **Authority.**  Any individual signing below on behalf of a corporation, partnership, limited liability company or other entity personally represents that he has full authority to bind the party or parties on whose behalf he is signing.

38.     **Executive Order 13224.**  To enable Franchisor to comply with U.S. Executive Order 13224, Franchisee hereby represents and warrants to Franchisor that neither Franchisee, nor any of its equity owners, directors, officers, employees, representatives and agents (collectively, the "Included People"), (a) is, or is owned or controlled by, a "suspected terrorist," as defined in Executive Order 13224 and (b) to the best of Franchisee's knowledge, has any of the Included People been designated a "suspected terrorist," as defined in Executive Order 13224.

[the balance of the page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Agreement, or caused this Agreement to be executed, as of ___JANUARY 28 2004___.

NAME OF FRANCHISEE: ___MICHAEL J. DISTEFANO___

Check One:
- [X] Individual
- [ ] Corporation
- [ ] General Partnership
- [ ] Limited Partnership
- [ ] Limited Liability Company
- [ ] Other Entity (Identify) _____

State of Organization or Residence: ___NEW YORK___

Executed By: ___Michael DiStefano___
(Sign Name)

___MICHAEL DISTEFANO___
(Print Name)

If executed on behalf of a corporation, a partnership, a limited liability company or another type of entity, list title: ___3333 MURDOCK AVE___

Address: ___OCEANSIDE NY 11572___

Phone No. ___516 763 6561___

Mobile No. ___917 885 8852___

Fax No. ___718 426 9155___

E-mail address ___DRMIKEDISTO@AOL.COM___

Principals of Franchisee (Shareholders, Partners, Members, Etc.—Total MUST equal 100%)

| Name | % Ownership |
|------|-------------|
| MICHAEL DISTEFANO | 100% |

COLD STONE CREAMERY, INC.

By: _____

Name:
Title: **David Andow**
**Exec Vice President**

The only persons authorized to sign this Agreement on behalf of Franchisor are Douglas A. Ducey, Sheldon Harris and David Andow. No other person is authorized to bind Franchisor to this Agreement.

Case 3:11-cv-00124-RJC -DSC Document 1-2 Filed 03/11/11 Page 40 of 74

## CONSENT OF SPOUSE
(to be executed if Franchisee is a married individual)

The undersigned is the spouse of the Franchisee identified in the Franchise Agreement, dated as of _____, between his or her spouse and Cold Stone Creamery, Inc. (the "Agreement"), to which this Consent of Spouse is attached.

The undersigned hereby declares that he/she has read the Agreement, including each of the documents that are exhibits to or referenced in the Agreement, in its entirety and, being fully convinced of the wisdom and equity of the terms of the Agreement, including each of the documents that are exhibits to or referenced in the Agreement, and in consideration of the premises and of the provisions of the Agreement, the undersigned hereby expresses his or her acceptance of the same and does agree to its provisions.

The undersigned further agrees that in the event of the death of his or her spouse, the provisions of this Agreement, including each of the documents that are exhibits to or referenced in the Agreement, shall be binding upon him/her.

The undersigned further agrees that he/she will at any time make, execute and deliver such instruments and documents which may be necessary to carry out the provisions of the Agreement, including each of the documents that are exhibits to or referenced in the Agreement.

This instrument is not a present transfer or release of any rights which the undersigned may have in any of the community property of his or her marriage.

DATED _____

_____
(Signature of Spouse)

_____
(Print Name of Spouse)

**Exhibit A**
**Geographic Area Within Which Franchisee**
**is Required to Locate the Franchised Business**

**ONLY INITIAL IF** this location is not entitled to a right of first refusal pursuant to Section 3(c)
of the Franchise Agreement:

Franchisee's        Franchisor's
Initials             Initials

(MD)

_____    _____

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 42 of 74

# RIDER TO FRANCHISE AGREEMENT
## FOR ILLINOIS RESIDENTS ONLY

AGREEMENT, dated as of the date set forth at the end of this Agreement, by and between COLD STONE CREAMERY, INC., an Arizona corporation ("Franchisor"), and the franchisee identified at the end of this Agreement ("Franchisee").

That certain Franchise Agreement, dated as of the date hereof, by and between Franchisor and Franchisee, is amended as follows:

1.      The following shall be inserted as the last sentence of Section 26 of the Franchise Agreement:

> "Any representations made in the Offering Circular are not excluded from that on which Franchisee may rely."

2.      Sections 29(a) and (b) of the Franchise Agreement shall be revised to read as follows:

> "(a)    This Agreement will be governed by, and construed and enforced in accordance with, the law of Illinois, regardless of any conflict-of-law provisions to the contrary.

> "(b)    Each party agrees that any litigation between the parties will be commenced and maintained in the courts located in the county in Illinois in which Franchisee's principal business office is located, and each party consents to the jurisdiction of those courts."

The undersigned does hereby acknowledge receipt of this Rider.

IN WITNESS WHEREOF, the parties have executed this Agreement, or caused this Agreement to be executed, as of _____.

Cold Stone Creamery, Inc.                          Name of Franchisee:

                                                   _____

By: _____             Executed by:
        Name:
        Title:

The only persons authorized to sign this           _____
Agreement on behalf of Franchisor are              (Sign Name)
Douglas A. Ducey, Sheldon Harris and
David Andow.   No   other person is                _____
authorized to bind Franchisor to this              (Print Name)
Agreement.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 43 of 74

## RIDER TO FRANCHISE AGREEMENT
## FOR INDIANA RESIDENTS ONLY

AGREEMENT, dated as of the date set forth at the end of this Agreement, by and between **COLD STONE CREAMERY, INC.**, an Arizona corporation ("Franchisor"), and the franchisee identified at the end of this Agreement ("Franchisee").

1.      Indiana law prohibits Franchisor from operating a substantially identical business to that conducted by Franchisee pursuant to that certain Franchise Agreement, dated as of the date hereof, by and between Franchisor and Franchisee within a reasonable area, regardless of the trade name used by Franchisor.

2.      Indiana law prohibits Franchisor from requiring Franchisee to prospectively assent to a release, assignment, novation, waiver or estoppel which purports to relieve any person from liability to be imposed pursuant to the Indiana Deceptive Franchise Practices Act or requiring any controversy between Franchisee and Franchisor to be referred to any person, if referral would be binding upon Franchisee. Such prohibition does not apply to arbitration before an independent arbitrator.

3.      Indiana law prohibits Franchisor from limiting litigation brought for breach of the terms of the Franchise Agreement.

4.      Indiana law may prohibit Franchisor from designating Arizona law to govern the Franchise Agreement. If it is so construed, Indiana law will govern the Franchise Agreement.

5.      The Franchise Agreement contains a covenant not to compete. Indiana law prohibits Franchisor from requiring Franchisee to covenant not to compete with Franchisor for a period longer than three (3) years or in an area greater than the exclusive area granted by the Franchise Agreement or, in the absence of such a provision in the agreement, an area of reasonable size, upon termination of or failure to renew the franchise.

The undersigned does hereby acknowledge receipt of this Rider.

IN WITNESS WHEREOF, the parties have executed this Agreement, or caused this Agreement to be executed, as of _____.

Cold Stone Creamery, Inc.

By: _____
        Name:
        Title:

The only persons authorized to sign this Agreement on behalf of Franchisor are Douglas A. Ducey, Sheldon Harris and David Andow. No other person is authorized to bind Franchisor to this Agreement.

Name of Franchisee:

_____

Executed by:

_____
(Sign Name)

_____
(Print Name)

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 44 of 74

## RIDER TO FRANCHISE AGREEMENT
## FOR MARYLAND RESIDENTS ONLY

AGREEMENT, dated as of the date set forth at the end of this Agreement, by and between COLD STONE CREAMERY, INC., an Arizona corporation ("Franchisor"), and the franchisee identified at the end of this Agreement ("Franchisee").

That certain Franchise Agreement, dated as of the date hereof, by and between Franchisor and Franchisee, is amended as follows:

1.      The provisions of Section 2 are not intended to, nor shall they, act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

2.      The general release required as a condition of renewal, sale and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

3.      Pursuant to the Maryland Franchise Registration and Disclosure Law, litigation arising out of the Franchise Agreement may be conducted in Maryland.

4.      Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within three years after the grant of the Franchise.

5.      The Franchise Agreement will be amended to the effect that the franchise fee and any other initial fee or payment payable to Franchisor will be payable upon the opening of Franchisee's Franchised Business.

The undersigned does hereby acknowledge receipt of this Rider.

IN WITNESS WHEREOF, the parties have executed this Agreement, or caused this Agreement to be executed, as of _____.

Cold Stone Creamery, Inc.

By: _____
           Name:
           Title:

The only persons authorized to sign this Agreement on behalf of Franchisor are Douglas A. Ducey, Sheldon Harris and David Andow.   No other person is authorized to bind Franchisor to this Agreement.

Name of Franchisee:

_____

Executed by:

_____
(Sign Name)

_____
(Print Name)

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 45 of 74

# RIDER TO FRANCHISE AGREEMENT
## FOR MINNESOTA RESIDENTS ONLY

AGREEMENT, dated as of the date set forth at the end of this Agreement, by and between COLD STONE CREAMERY, INC., an Arizona corporation ("Franchisor"), and the franchisee identified at the end of this Agreement ("Franchisee").

That certain Franchise Agreement, dated as of the date hereof, by and between Franchisor and Franchisee, is amended as follows:

1.      The provisions of Minnesota Statutes Section 80C.21 and Minnesota Rule 2860.440J prohibit Franchisor from requiring litigation to be conducted outside Minnesota. In addition, nothing in this Franchise Agreement can abrogate or reduce any of Franchisee's rights as provided for in Minnesota Statutes, Chapter 80C, or Franchisee's rights to any procedure, forum or remedies provided for by the laws of the jurisdiction. In connection therewith, Sections 13(f), 14(f)(iv) and 15(b)(v) shall be deleted and the last sentence of Sections 8(g), 13(e) and 17(c) shall be revised to read as follows:

> "Franchisee agrees that the rights conveyed by this Agreement are of a unique and special nature and that Franchisor's remedy at law for any breach would be inadequate."

2.      Section 29(c) of the Franchise Agreement shall be deleted.

3.      Franchisor will comply with Minnesota Statutes Section 80C.14, Subdivisions 3, 4 and 5, which require, except in certain specified cases, that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of this Franchise Agreement. Sections 15 and 16 shall be amended as strictly necessary to comply with such provisions.

4.      Minnesota Rule 2860.440D prohibits Franchisor from requiring Franchisee to execute a general release in connection with renewal or transfer of the franchise.

The undersigned does hereby acknowledge receipt of this Rider.

IN WITNESS WHEREOF, the parties have executed this Agreement, or caused this Agreement to be executed, as of _____.

Cold Stone Creamery, Inc.                          Name of Franchisee:

                                                   _____

By: _____
       Name:                                       Executed by:
       Title:

The only persons authorized to sign this           _____
Agreement on behalf of Franchisor are              (Sign Name)
Douglas A. Ducey, Sheldon Harris and
David Andow.     No other person is                _____
authorized to bind Franchisor to this              (Print Name)
Agreement.

110103                          C-46                       franchise.agreement.2003

## RIDER TO FRANCHISE AGREEMENT
## FOR NORTH DAKOTA RESIDENTS ONLY

AGREEMENT, dated as of the date set forth at the end of this Agreement, by and between COLD STONE CREAMERY, INC., an Arizona corporation ("Franchisor"), and the franchisee identified at the end of this Agreement ("Franchisee").

That certain Franchise Agreement, dated as of the date hereof, by and between Franchisor and Franchisee, is amended as follows:

1.      Section 15(b)(v) of the Franchise Agreement is hereby deleted.

2.      Section 30 of the Franchise Agreement is subject to the following: In any arbitration involving a franchise purchased in North Dakota, the arbitration site shall be in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

3.      Section 29 of the Franchise Agreement is subject to the following: (a) litigation may be conducted in North Dakota, (b) North Dakota law will govern the Franchise Agreement and (c) paragraph (c) shall be deleted.

4.      Section 13(g) of the Franchise Agreement is hereby deleted.

5.      Section 13(c) of the Franchise Agreement is subject to Section 9-08-06 of the North Dakota Century Code and, therefore, may be unenforceable in the State of North Dakota.

The undersigned does hereby acknowledge receipt of this Rider.

IN WITNESS WHEREOF, the parties have executed this Agreement, or caused this Agreement to be executed, as of _____.

Cold Stone Creamery, Inc.            Name of Franchisee:

                                _____

By: _____

      Name:                       Executed by:
      Title:

The only persons authorized to sign this Agreement on behalf of Franchisor are Douglas A. Ducey, Sheldon Harris and David Andow. No other person is authorized to bind Franchisor to this Agreement.

                                  _____
                                  (Sign Name)

                                  _____
                                  (Print Name)

## CONSENT OF SPOUSE

The undersigned is the spouse of the Franchisee identified in the Rider to Franchise Agreement, dated as of _____, between his or her spouse and Cold Stone Creamery, Inc. (the "Agreement"), to which this Consent of Spouse is attached.

The undersigned hereby declares that he or she has read the Agreement in its entirety and, being fully convinced of the wisdom and equity of the terms of the Agreement, and in consideration of the premises and of the provisions of the Agreement, the undersigned hereby expresses his or her acceptance of the same and does agree to its provisions.

The undersigned further agrees that in the event of the death of his or her spouse, the provisions of this Agreement shall be binding upon him or her.

The undersigned further agrees that he or she will at any time make, execute and deliver such instruments and documents which may be necessary to carry out the provisions of the Agreement.

This instrument is not a present transfer or release of any rights which the undersigned may have in any of the community property of his or her marriage.

DATED _____

_____
(Signature of Spouse)


_____
(Print Name of Spouse)

## AGREEMENT TO BE BOUND AND TO GUARANTEE

AGREEMENT, dated as of the date set forth at the end of this Agreement, executed by the guarantors identified in Section 19 of this Agreement (each a "Guarantor") in favor of Cold Stone Creamery, Inc. ("Cold Stone").

WHEREAS, as an inducement for Cold Stone to execute and deliver, and to perform its obligations under, that certain Franchise Agreement (the "Franchise Agreement"), dated as of the date set forth in Section 19 of this Agreement, by and between Cold Stone and the franchisee identified in Section 19 of this Agreement ("Franchisee"), Guarantor has agreed to jointly and severally guarantee the obligations of Franchisee under the Franchise Agreement and have agreed to be bound by certain of the provisions contained in the Franchise Agreement.

WHEREAS, Guarantor owns, directly or indirectly, a 5% or greater equity interest in Franchisee.

WHEREAS, Guarantor acknowledges and agrees that Cold Stone will materially rely upon Guarantor's obligations under this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the execution and delivery of the Franchise Agreement by Cold Stone, and the performance of Cold Stone's obligations thereunder, Guarantor agrees, for the benefit of Cold Stone and its Affiliates (as defined in the Franchise Agreement), as follows:

1.    Guaranty.  Guarantor unconditionally guarantees and promises to pay to Cold Stone and/or its Affiliates and to perform, for the benefit of Cold Stone and/or its Affiliates, on demand, any and all obligations and liabilities of Franchisee in connection with, with respect to or arising out of the Franchise Agreement or any other agreement with Cold Stone or its Affiliates.

2.    Confidentiality.

(a)    Guarantor acknowledges that Cold Stone is engaged in a highly competitive business, the success of which is dependent upon, among other things, trade secrets and other confidential and proprietary information, processes, materials and rights relating to the development, promotion and operation of the Franchised Business (as defined in the Franchise Agreement), including, without limitation, Cold Stone's Operating Manual, method of operation, processes, techniques, formulae and procedures (collectively, the "Proprietary Information"). Guarantor further acknowledges that the Proprietary Information constitutes valuable trade secrets.

(b)    Guarantor agrees not to use for any purpose, or disclose or reveal (and must cause all of Franchisee's directors, officers and employees not to use for any purpose, or disclose or reveal), during the term of this Agreement or forever thereafter, to any person any contents of Cold Stone's Operating Manual, any Proprietary Information or any other information relating to the operation of the Franchised Business. Guarantor must fully and strictly comply with all security measures prescribed by Cold Stone for maintaining the confidentiality of all Proprietary Information.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 49 of 74

(c)     Guarantor acknowledges that to breach his or her obligations under this Section 2 would cause damage to Cold Stone and to Cold Stone's other franchisees, and that Guarantor would be liable for this damage.

(d) Notwithstanding the foregoing, Guarantor may disclose Proprietary Information to a person who is bound by the terms of this provision regarding confidentiality and a restrictive covenant contemplated by Section 13 of the Franchise Agreement, to the extent that that disclosure is necessary in connection with that person's capacity with Franchisee.

(e)     Notwithstanding the foregoing, the following will not be subject to the provisions of this Section 2:

(i)     Information which is in the public domain as of the date of receipt by Franchisee;

(ii)     Information which is known to Franchisee prior to the date of receipt by Franchisee;

(iii)     Information which becomes known to the public without a breach of the provisions of this Section 13 or any agreement executed in connection with the Franchise Agreement; and

(iv) Information which is required by law to be disclosed or revealed, but only strictly to the extent required by law.

3.     <u>Covenant Not to Compete.</u>

(a)     Guarantor may not, during the term of this Agreement and for the one-year period after the expiration or termination of this Agreement for any reason, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product within, or for consumption within, a 10-mile radius of any Cold Stone Creamery® restaurant or any location with respect to which a contract has been entered into in connection with the future operation of a Cold Stone Creamery® restaurant.

(b)     Guarantor may not, during the term of this Agreement and for the one-year period after the expiration or termination of this Agreement for any reason, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product within, or for consumption within, the United States.

(c)     Guarantor may not, during the term of this Agreement and for the one-year period after the expiration or termination of this Agreement for any reason, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 50 of 74

sells ice cream, frozen yogurt or any other frozen dessert product outside of, or for consumption outside of, the United States.

(d) For purposes of this Section 3, a business will be deemed to be marketing or selling ice cream, frozen yogurt or another frozen dessert product if more than 15% of its gross sales are derived from the marketing or sale of such products.

4. <u>Restriction on Hiring</u>. Guarantor may not, during the term of this Agreement and for the one-year period after the expiration or termination of this Agreement for any reason, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), employ, hire or engage as an independent contractor or otherwise any person who is or was (at any time during the term of this Agreement) employed or engaged as an independent contractor or otherwise by Cold Stone or any of its Affiliates.

5. <u>Use of Name and Likeness</u>. Cold Stone will be entitled to use the name, likeness and voice of Guarantor for purposes of promoting the franchise, Cold Stone and its products, including, without limitation, all photos and audio and video recordings, and Guarantor hereby irrevocably consents thereto. Guarantor acknowledges that Cold Stone will own all right, title and interest, to the extent allowed by law, in all rights of integrity, disclosure and publication and any other rights that may be known as or referred to as "moral rights," "artist's rights," "publicity rights" or the like associated with such photos and audio and video recordings, and assigns and transfers unto Cold Stone the full and exclusive right, title, and interest to such publicity rights.

6. <u>Innovations</u>. Guarantor may conceive, invent, create, design and/or develop various ideas, techniques, methods, processes and procedures, recipes, formulae, products, packaging or other concepts and features relating to the manufacturing, production, marketing and sale of ice cream, frozen yogurt, other frozen desserts and related goods in connection with the Franchised Business (the "Innovations"). Guarantor assigns any and all of its rights, title and interest in the Innovations, including, without limitation, any intellectual property rights, to Cold Stone, and also agrees to cooperate with Cold Stone and its counsel in the protection of the Innovations, including, without limitation, the perfecting of title thereto.

7. <u>Copyrights; Works-for-Hire; Solicitation</u>. All advertising and promotional materials generated by or for Franchisee or its officers, managers or employees for the Franchised Business will be deemed a work-made-for-hire, and all ownership rights, including, without limitation, any copyrights, in such advertising and promotional materials are hereby assigned to Cold Stone. In addition, Guarantor will cooperate in the protecting any items or materials suitable for copyright protection by Cold Stone. Guarantor must not solicit other franchisees or area developers, or use the lists of franchisees and area developers, for any commercial or other purpose other than purposes directly related to the operation of the Franchised Businesses.

8. <u>Guaranty of Payment</u>. This is a guaranty of payment and not of collection. This Agreement shall remain in full force and effect until all amounts payable by Guarantor shall have been validly, finally and irrevocably paid in full and all obligations to be performed by Guarantor shall have been validly, finally and irrevocably performed in full.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 51 of 74

9. <u>Waiver</u>. Guarantor hereby waives all requirements as to presentment for payment, protest, diligence and demand and notice of acceptance, default, protest, demand, dishonor and nonpayment, and all benefits and requirements of Arizona Revised Statutes Section 12-1641, *et seq.*, and Rule 17(f) of the Arizona Rules of Civil Procedure for the Superior Courts of Arizona, which set forth certain rights and obligations among guarantors, debtors and creditors, if applicable. This Agreement shall not be affected in any way by (a) the absence of any action to obtain such amounts from Franchisee or any other guarantor or indemnitor or of any recourse to any security for such amounts or (b) any extension, waiver, compromise or release of any or all of the obligations of Franchisee or any guarantor.

10. <u>Subrogation</u>. Guarantor hereby agrees that he will not exercise any rights of subrogation which he may acquire due to any payment or performance of the obligations of Franchisee pursuant to this Agreement unless and until all amounts payable to Cold Stone or its Affiliates, and all obligations for the benefit of Cold Stone or its Affiliates, shall have been validly, finally and irrevocably paid and performed in full.

11. <u>Reasonable Restraints; Remedies</u>. Guarantor acknowledges that the covenants contained in this Agreement (including, without limitation, the territorial and time restraints) are reasonable and necessary and agrees that his failure to adhere strictly to the restrictions contained herein shall cause substantial and irreparable damage to Cold Stone, Franchisee and to Cold Stone's other franchisees. In the event of any breach by Guarantor of any of the terms of this Agreement, Cold Stone and/or Franchisee shall be entitled to institute and prosecute proceedings, at law or in equity, in any court of competent jurisdiction, to obtain an injunction to enforce the provisions of this Agreement and to pursue any other remedy to which Cold Stone and/or Franchisee may be entitled. Guarantor agrees that the rights conveyed by this Agreement are of a unique and special nature and that Cold Stone's and Franchisee's remedy at law for any breach would be inadequate and agrees and consents that temporary or permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision hereof, without the necessity of posting bond therefor or proof of actual damages.

12. <u>Enforceability</u>. If the scope of any restriction contained in this Agreement is too broad to permit the enforcement of such restriction to its fullest extent, then such restriction shall be enforced to the maximum extent permitted by law, and Guarantor hereby consents and agrees that such scope may be judicially limited or modified accordingly in any proceeding brought to enforce such restriction. Each covenant contained in this Agreement is independent and severable and, to the extent that any such covenant shall be declared by a court of competent jurisdiction to be illegal, invalid or unenforceable, such declaration shall not affect the legality, validity or enforceability of any other provision contained herein or the legality, validity or enforceability of such covenant in any other jurisdiction.

13. <u>No Waiver</u>. No failure or delay on the part of Cold Stone or its Affiliates in exercising its rights hereunder shall operate as a waiver of, or impair, any such right. No single or partial exercise of any such right shall preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right shall be effective unless given in writing, specifying with particularity the nature of the waiver. No waiver of any such right shall be deemed a waiver of any other right hereunder. The rights provided for herein are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 52 of 74

14.    Attorneys' Fees. Guarantor shall pay reasonable attorneys' fees and expenses and all other costs and expenses which may be incurred by Cold Stone or its Affiliates in connection with enforcing this Agreement.

15.    Arizona Law to Govern; Jurisdiction; Right to Jury Trial Waived; Certain Damages Waived. This Agreement will be governed by, and construed and enforced in accordance with, the law of Arizona, regardless of any conflict-of-law provisions to the contrary. Each party agrees that any litigation between the parties will be commenced and maintained only in the courts located in Maricopa County, Arizona, and each party consents to the jurisdiction of those courts. Guarantor hereby waives the right to a jury trial and waives the right to seek or collect punitive, consequential and special damages. Notwithstanding the foregoing, pursuant to the Maryland Franchise Registration and Disclosure Law, litigation arising under the Maryland Franchise Registration and Disclosure Law arising out of this Agreement may be conducted in Maryland.

16.    Binding Nature of Agreement. This Agreement shall be binding upon Guarantor and his respective successors, heirs and assigns and shall inure to the benefit of Cold Stone, its Affiliates and their respective successors and assigns.

17.    Joint and Several. If more than one person signs this Agreement as a Guarantor, his, her or its obligation shall be joint and several.

18.    Entire Agreement; Amendment. This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing signed by each of the parties hereto. The provisions of Section 18 are not intended to, nor shall they, act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

19.    Date of Franchise Agreement:_____ *1-28-04*_____
       Name(s) of Guarantor(s): ____ *MICHAEL DISTEFANO*_____

       Name of Franchisee:_____ *MICHAEL DISTEFANO*_____

EXECUTED as of _____

Name:__ *MICHAEL DISTEFANO*_____    Name:_____
       (Print Name)                           (Print Name)

Executed by:__ *[signature]*_____    Executed by:_____
       (Sign Name)                           (Sign Name)

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 53 of 74

## CONSENT OF SPOUSE

The undersigned spouse of a party to the foregoing Agreement to be Bound and to Guarantee (the "Agreement") confirms that he/she has read the Agreement, understands same and consents and agrees to the terms of the Agreement.

Date: _____

_____          _____
(Sign Name)                                                        (Sign Name)


_____          _____
(Print Name)                                                       (Print Name)

14.     Attorneys' Fees.  Guarantor shall pay reasonable attorneys' fees and expenses and all other costs and expenses which may be incurred by Cold Stone or its Affiliates in connection with enforcing this Agreement.

15.     Arizona Law to Govern; Jurisdiction; Right to Jury Trial Waived; Certain Damages Waived.  This Agreement will be governed by, and construed and enforced in accordance with, the law of Arizona, regardless of any conflict-of-law provisions to the contrary.  Each party agrees that any litigation between the parties will be commenced and maintained only in the courts located in Maricopa County, Arizona, and each party consents to the jurisdiction of those courts.  Guarantor hereby waives the right to a jury trial and waives the right to seek or collect punitive, consequential and special damages.  Notwithstanding the foregoing, pursuant to the Maryland Franchise Registration and Disclosure Law, litigation arising under the Maryland Franchise Registration and Disclosure Law arising out of this Agreement may be conducted in Maryland.

16.     Binding Nature of Agreement.  This Agreement shall be binding upon Guarantor and his respective successors, heirs and assigns and shall inure to the benefit of Cold Stone, its Affiliates and their respective successors and assigns.

17.     Joint and Several.  If more than one person signs this Agreement as a Guarantor, his, her or its obligation shall be joint and several.

18.     Entire Agreement; Amendment.  This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.  This Agreement may not be modified or amended other than by an agreement in writing signed by each of the parties hereto.  The provisions of Section 18 are not intended to, nor shall they, act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

19.     Date of Franchise Agreement:_____4/4/04_____

        Name(s) of Guarantor(s): _____Michael DiStefano_____

        Name of Franchisee:_____Michael DiStefano_____

EXECUTED as of _____4/4/04_____


Name: _Michael DiStefano_            Name: _FRANCO TREGLIA_
       (Print Name)                          (Print Name)


Executed by _Michael DiStefano_      Executed by: _Franco Treglia_
            (Sign Name)                          (Sign Name)


110103                          D-5                    franchise.offeringcircular.2003

## CONSENT OF SPOUSE

The undersigned spouse of a party to the foregoing Agreement to be Bound and to Guarantee (the "Agreement") confirms that he/she has read the Agreement, understands same and consents and agrees to the terms of the Agreement.

Date: _____04/04/04_____

_Nicole DiStefano_ _____
(Sign Name)                        (Sign Name)

_NICOLE DiStefano_ _____
(Print Name)                       (Print Name)

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 56 of 74

AUTHORIZATION TO HONOR CHECKS DRAWN BY AND PAYABLE TO:

COLD STONE CREAMERY, INC.

| BANK ACCOUNT IN THE NAME OF | STORE # | BANK ACCOUNT NUMBER |
|---|---|---|
| 1. | 2. 1324 | 3. |

To The Bank Designated:

You are hereby requested and authorized to honor and to charge to the account described checks drawn on such account which are payable to the above named Payee. The name(s) of the depositor(s) on such checks will be printed by standard business machines. It is agreed that your rights with respect to each such check shall be the same as if it bore a signature authorized for such account. It is further agreed that if any such check is not honored, whether with or without cause you shall be under no liability whatsoever. This authorization shall continue in force until revocation in writing is received by you.

4. Date: 1/28/04

5. Name of Franchisee (please print)

MICHAEL DISTEFANO

Type of Business: ICE CREAM SALES

Executed by: MICHAEL DISTEFANO

Title: OWNER

| FULL NAME OF BANK |
|---|
| 6. |
| STREET ADDRESS |
| 7. |
| CITY, STATE, ZIP CODE |
| 8. |

Drawee Bank Please Note: There is an Indemnification Agreement on the reverse side.

## Indemnification Agreement

To The Bank Designated:

In consideration of your compliance with the request and authorization printed on the Authorization Form hereof, the Payee agrees with respect to any such action:

(1)     To indemnify you and hold you harmless from any loss you may suffer as a consequence of your actions resulting from or in connection with the execution and issuance of any check, draft or order, whether or not genuine, purporting to be executed by the Payee and received by you in the regular course of business for the purpose of payment, including any costs or expenses reasonably incurred in connection therewith.

(2)     To indemnify you for any loss arising in the event that any such check, draft or order shall be dishonored, whether with or without cause and whether intentionally or inadvertently.

(3)     To defend at our own cost and expense any action which might be brought by any depositor or any other persons because of your actions taken pursuant to the foregoing request, or in any manner arising by reason of your participation.

---

### NOTICE TO OWNER

1.     ATTACH ONE VOIDED CHECK HERE.

2.     BE SURE ALL 9 SPACES SHOWN ABOVE ARE COMPLETED.

3.     RETURN ALL THREE COPIES IMMEDIATELY.

## RESTRICTIVE COVENANT

AGREEMENT, dated as of the date set forth at the end of this Agreement, executed by the party identified in Section 10 of this Agreement ("Party") and the franchisee identified in Section 10 of this Agreement ("Franchisee").

WHEREAS, Franchisee is a franchisee of Cold Stone Creamery, Inc. ("Franchisor") and, in that capacity, Franchisee is engaged in the business of producing and selling ice cream and frozen yogurt (the "Franchised Business").

WHEREAS, Party desires to be employed or appointed, or to continue to be employed or appointed, by Franchisee as an officer, manager or employee of Franchisee.

WHEREAS, In connection therewith, Party will have access and/or has had access to information that requires Franchisor's and Franchisee's highest trust and confidence in Party.

WHEREAS, Party acknowledges and agrees that Franchisee and Franchisor will materially rely upon Party's obligations under this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, the compensation paid or to be paid to Party, and/or other good and valuable consideration, Party covenants and agrees as follows:

1.      Confidential Information.

    (a)     Party acknowledges that Franchisor and Franchisee are engaged in a highly competitive business, the success of which is dependent upon, among other things, trade secrets and other confidential and proprietary information, processes, materials and rights relating to the development, promotion and operation of the Franchised Business, including, without limitation, Franchisor's and Franchisee's Operating Manual, method of operation, processes, techniques, formulae and procedures (collectively, the "Proprietary Information"). Party further acknowledges that the Proprietary Information constitutes valuable trade secrets.

    (b)     Party covenants and agrees not to use for any purpose, or disclose or reveal, during the term of Party's employment or other association with Franchisee and forever thereafter, to any person any Proprietary Information. In connection therewith, Party shall fully and strictly comply with all security measures prescribed by Franchisor and/or Franchisee for maintaining the confidentiality of all Proprietary Information.

    (c)     Upon the termination of Party's employment or other association with Franchisee, Party shall deliver promptly to Franchisee all documents containing Proprietary Information, whether or not prepared by or for Party.

    (d)     Party acknowledges that to breach its obligations under this Section 1 would cause damage to Franchisor, Franchisee and Franchisor's other franchisees, and that Party would be liable for such damage.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 59 of 74

(e)    Notwithstanding the foregoing, Party may disclose Proprietary Information to a person who is bound by the terms of a similar provision or agreement regarding confidentiality and a restrictive covenant contemplated by Section 13 of the Franchise Agreement, to the extent that that disclosure is necessary in connection with that person's capacity with Franchisee. In addition, notwithstanding the foregoing, Party may use the Proprietary Information as shall be necessary in connection with the operation of the Cold Stone Creamery® restaurant with which Party is employed or otherwise associated.

(f)    Notwithstanding the foregoing, the following shall not be subject to the provisions of this Section 1:

   (i)    Information which is in the public domain as of the date of receipt by Franchisee;

   (ii)    Information which is known to Franchisee prior to the date of receipt by Franchisee;

   (iii)    Information which becomes known to the public without a breach of any confidentiality agreement or provision in favor of Franchisor or Franchisee; and

   (iv)    Information which is required by law to be disclosed or revealed, but only strictly to the extent required by law.

2.    <u>Covenant Not to Compete</u>.

(a)    Party shall not, during the term of Party's employment or other association with Franchisee and during the Restrictive Period (as defined below), directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product within, or for consumption within, a 10-mile radius of any Cold Stone Creamery® restaurant or any location with respect to which a contract has been entered into in connection with the future operation of a Cold Stone Creamery® restaurant.

(b)    Party shall not, during the term of Party's employment or other association with Franchisee and during the Restrictive Period, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product within, or for consumption within, the United States.

(c) Party shall not, during the term of Party's employment or other association with Franchisee and during the Restrictive Period, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product outside of, or for consumption outside of, the United States.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 60 of 74

(d)     For purposes of this Section 2, a business will be deemed to be marketing or selling ice cream, frozen yogurt or another frozen dessert product if more than 15% of its gross sales are derived from the marketing or sale of such products.

(e)     For purposes of this Section 2, the "Restrictive Period" is defined as (i) in the case of an officer of Franchisee, the one-year period beginning at the termination of his or her serving as an officer of Franchisee and (ii) in the case of a manager or employee of the Franchised Business, the six-month period beginning at the termination of his or her employment other association with Franchisee.

3.      <u>Restriction on Hiring</u>.  Party may not, during the term of Party's employment or other association with Franchisee and during the Restrictive Period, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), employ, hire or engage as an independent contractor or otherwise any person who is or was (at any time during the term of this Agreement) employed or engaged as an independent contractor or otherwise by Franchisor or any of its affiliates.

4.      <u>Use of Name and Likeness</u>.  Franchisor will be entitled to use the name, likeness and voice of Party for purposes of promoting the franchise, Franchisor and its products, including, without limitation, all photos and audio and video recordings of Party, and Party hereby irrevocably consents thereto.  Party acknowledges that Franchisor will own all right, title and interest, to the extent allowed by law, in all rights of integrity, disclosure and publication and any other rights that may be known as or referred to as "moral rights," "artist's rights," "publicity rights" or the like associated with such photos and audio and video recordings, and assigns and transfers unto Franchisor the full and exclusive right, title, and interest to such publicity rights.

5.      <u>Innovations</u>.  Party may conceive, invent, create, design and/or develop various ideas, techniques, methods, processes and procedures, recipes, formulae, products, packaging or other concepts and features relating to the manufacturing, production, marketing and sale of ice cream, frozen yogurt, other frozen desserts and related goods in connection with the Franchised Business (the "Innovations").  Party assigns any and all of its rights, title and interest in the Innovations, including, without limitation, any intellectual property rights, to Franchisor, and also agrees to cooperate with Franchisor and its counsel in the protection of the Innovations, including, without limitation, the perfecting of title thereto.

6.      <u>Copyrights; Works-for-Hire; Solicitation</u>.  All advertising and promotional materials generated by or for Franchisee or its officers, managers or employees for the Franchised Business will be deemed a work-made-for-hire, and all ownership rights, including, without limitation, any copyrights, in such advertising and promotional materials are hereby assigned to Franchisor.  In addition, Party will cooperate in the protecting any items or materials suitable for copyright protection by Franchisor.  Party must not solicit other franchisees or area developers, or use the lists of franchisees and area developers, for any commercial or other purpose other than purposes directly related to the operation of the Franchised Businesses.

7.      <u>Reasonable Restraints; Remedies</u>.  Party acknowledges that the covenants contained in this Agreement (including, without limitation, the territorial and time restraints) are reasonable and

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 61 of 74

necessary and agrees that his failure to adhere strictly to the restrictions contained herein shall cause substantial and irreparable damage to Franchisor, Franchisee and to Franchisor's other franchisees. In the event of any breach by Party of any of the terms of this Agreement, Franchisor and/or Franchisee shall be entitled to institute and prosecute proceedings, at law or in equity, in any court of competent jurisdiction, to obtain an injunction to enforce the provisions of this Agreement and to pursue any other remedy to which Franchisor and/or Franchisee may be entitled. Party agrees that the rights conveyed by this Agreement are of a unique and special nature and that Franchisor's and Franchisee's remedy at law for any breach would be inadequate and agrees and consents that temporary or permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision hereof, without the necessity of posting bond therefor or proof of actual damages.

8.    Modification; Severability. If the scope of any restriction contained in this Agreement is too broad to permit the enforcement of such restriction to its fullest extent, then such restriction shall be enforced to the maximum extent permitted by law, and Party hereby consents and agrees that such scope may be judicially limited or modified accordingly in any proceeding brought to enforce such restriction. Each covenant contained in this Agreement is independent and severable and, to the extent that any such covenant shall be declared by a court of competent jurisdiction to be illegal, invalid or unenforceable, such declaration shall not affect the legality, validity or enforceability of any other provision contained herein or the legality, validity or enforceability of such covenant in any other jurisdiction.

9.    General and Miscellaneous.

        (a)    Entire Agreement; Amendment. This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing signed by each of the parties hereto.

        (b)    Binding Nature of Agreement. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

        (c)    Arizona Law to Govern; Jurisdiction; Right to Jury Trial Waived; Certain Damages Waived. This Agreement will be governed by, and construed and enforced in accordance with, the law of Arizona, regardless of any conflict-of-law provisions to the contrary. Each party agrees that any litigation between the parties will be commenced and maintained only in the courts located in Maricopa County, Arizona, and each party consents to the jurisdiction of those courts. Party hereby waives the right to a jury trial and waives the right to seek or collect punitive, consequential and special damages.

        (d)    Third Party Beneficiary. Franchisor is an express third party beneficiary of this Agreement and may, directly or indirectly, enforce any obligation of Party hereunder.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 62 of 74

10.    Identification of Parties.

     (a)    The person identified as "Party" in this Agreement is _____
_____.

     (b)    The person identified as "Franchisee" in this Agreement is _____
_____.

Party has read this entire Agreement carefully and fully understands the limitations that this Agreement imposes upon him and acknowledges and agrees that those limitations are reasonable.

EXECUTED as of _____.

 

_____

Signature of Party

Franchisee:_____

By:_____
        Name:_____
        Title:_____

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 63 of 74



# RESTRICTIVE COVENANT

AGREEMENT, dated as of _March 28, 2005_, executed by _____ Susan Landgraf _____ ("Party") and _Nicole Distefano_ ("Franchisee"), Store # and location _1328, Howard Beach,_ NY

WHEREAS, Franchisee is engaged in the business of producing and selling ice cream and frozen yogurt.

WHEREAS, Party desires to be employed, or to continue to be employed, by Franchisee as a manager and/or attend the training program offered by Cold Stone Creamery, Inc., an Arizona corporation ("Franchisor").

WHEREAS, In connection therewith, Party will have access and/or has had access to information that requires Franchisor's and Franchisee's highest trust and confidence in Party.

WHEREAS, Party acknowledges and agrees that Franchisee and Franchisor will materially rely upon Party's obligations under this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, the compensation paid or to be paid to Party, and/or other good and valuable consideration, Party covenants and agrees as follows:

1.   Confidential Information.

(a)     Party acknowledges that Franchisor and Franchisee are engaged in a highly competitive business, the success of which is dependent upon, among other things, confidential and proprietary information, including, without limitation, Franchisor's and Franchisee's Operating Manual, method of operation, processes, techniques, formulae and procedures (collectively, the "Proprietary Information"). Party further acknowledges that the Proprietary Information constitutes valuable trade secrets.

(b)     Party covenants and agrees not to use for any purpose, or disclose or reveal, during the term of Party's employment or other association with Franchisee and thereafter, to any person any Proprietary Information. In connection therewith, Party shall fully and strictly comply with all security measures prescribed by Franchisor and/or Franchisee for maintaining the confidentiality of all Proprietary Information.

(c)     Upon the termination of Party's employment or other association with Franchisee, Party shall deliver promptly to Franchisee all documents containing Proprietary Information, whether or not prepared by or for Party.

(d)     Party acknowledges that to breach its obligations under this Section 1 would cause damage to Franchisor, Franchisee and Franchisor's other franchisees, and that Party would be liable for such damage.

(e)     Notwithstanding the foregoing, Party may disclose Proprietary Information to a person who is bound by the terms of a similar provision or agreement regarding confidentiality and a restrictive covenant contemplated by Section 2 hereof. In addition, notwithstanding the foregoing, Party may use the Proprietary Information as shall be necessary in connection with the operation of the Cold Stone Creamery restaurant with which Party is employed or otherwise associated.

(f)     Notwithstanding the foregoing, the following shall not be subject to the provisions of this Section 1:

(I)     Information which is in the public domain as of the date of receipt by Franchisee;

(ii)     Information which becomes known to the public without a breach of any confidentiality agreement or provision in favor of Franchisor or Franchisee; and

(iii)     Information which is required by law to be disclosed or revealed, but only strictly to the extent required by law.

2.      Covenant Not to Compete.  Party shall not, during the term of Party's employment or other association with Franchisee and for the two-year period thereafter, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product within, or for consumption within the United States.

3.      Reasonable Restraints; Remedies.  Party acknowledges that the covenants contained in this Agreement (including, without limitation, the territorial and time restraints) are reasonable and necessary and agrees that his failure to adhere strictly to the restrictions contained herein shall cause substantial and irreparable damage to Franchisor, Franchisee and to Franchisor's other franchisees.  In the event of any breach by Party of any of the terms of this Agreement, Franchisor and/or Franchisee shall be entitled to institute and prosecute proceedings, at law or in equity, in any court of competent jurisdiction, to obtain an injunction to enforce the provisions of this Agreement and to pursue any other remedy to which Franchisor and/or Franchisee may be entitled.  Party agrees that the rights conveyed by this Agreement are of a unique and special nature and that Franchisor's and Franchisee's remedy at law for any breach would be inadequate and agrees and consents that temporary or permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision hereof, without the necessity of posting bond therefor or proof of actual damages.

4.      Modification; Severability.  If the scope of any restriction contained in this Agreement is too broad to permit the enforcement of such restriction to its fullest extent, then such restriction shall be enforced to the maximum extent permitted by law, and Party hereby consents and agrees that such scope may be judicially limited or modified accordingly in any proceedings brought to enforce such restriction.  Each covenant contained in this Agreement is independent and severable and, to the extent that any such covenant shall be declared by a court of competent jurisdiction to be illegal, invalid or unenforceable, such declaration shall not affect the legality, validity or enforceability of any other provision contained herein or the legality, validity or enforceability of such covenant in any other jurisdiction.

5.      General and Miscellaneous.

(a)     Entire Agreement; Amendment.  This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whosoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof.  This Agreement may not be modified or amended other than by an agreement in writing signed by each of the parties hereto.

(b)     Binding Nature of Agreement.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

(c)     Governing Law.  This Agreement and all questions relating to its validity, interpretation, performance and enforcement will be governed by and construed, interpreted and enforced in accordance with the laws of the State of Arizona, notwithstanding any Arizona or other conflict of laws provisions to the contrary.

(d)     Third Party Beneficiary.  Franchisor is an express third party beneficiary of this Agreement and may, directly or indirectly, enforce any obligation of Party hereunder.

**Party has read this entire Agreement carefully and fully understands the limitations that this agreement imposes upon him and acknowledges and agrees that those limitations are reasonable.**

EXECUTED as of the date first set forth above.

Susan Landgraf
Name and Signature of Party

Name and Signature of Franchisee



# COLD STONE CREAMERY

## RESTRICTIVE COVENANT

AGREEMENT, dated as of _3/28/05_ , executed by _____Susan Landgraf_____
("Party") and _Michael DiStefano_ ("Franchisee"), Store # and location ___1328, Howard Beach__

WHEREAS, Franchisee is engaged in the business of producing and selling ice cream and frozen yogurt.

WHEREAS, Party desires to be employed, or to continue to be employed, by Franchisee as a manager and/or attend the training program offered by Cold Stone Creamery, Inc., an Arizona corporation ("Franchisor").

WHEREAS, In connection therewith, Party will have access and/or has had access to information that requires Franchisor's and Franchisee's highest trust and confidence in Party.

WHEREAS, Party acknowledges and agrees that Franchisee and Franchisor will materially rely upon Party's obligations under this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, the compensation paid or to be paid to Party, and/or other good and valuable consideration, Party covenants and agrees as follows:

1.    Confidential Information.

(a)    Party acknowledges that Franchisor and Franchisee are engaged in a highly competitive business, the success of which is dependent upon, among other things, confidential and proprietary information, including, without limitation, Franchisor's and Franchisee's Operating Manual, method of operation, processes, techniques, formulae and procedures (collectively, the "Proprietary Information"). Party further acknowledges that the Proprietary Information constitutes valuable trade secrets.

(b)    Party covenants and agrees not to use for any purpose, or disclose or reveal, during the term of Party's employment or other association with Franchisee and thereafter, to any person any Proprietary Information. In connection therewith, Party shall fully and strictly comply with all security measures prescribed by Franchisor and/or Franchisee for maintaining the confidentiality of all Proprietary Information.

(c)    Upon the termination of Party's employment or other association with Franchisee, Party shall deliver promptly to Franchisee all documents containing Proprietary Information, whether or not prepared by or for Party.

(d)    Party acknowledges that to breach its obligations under this Section 1 would cause damage to Franchisor, Franchisee and Franchisor's other franchisees, and that Party would be liable for such damage.

(e)    Notwithstanding the foregoing, Party may disclose Proprietary Information to a person who is bound by the terms of a similar provision or agreement regarding confidentiality and a restrictive covenant contemplated by Section 2 hereof. In addition, notwithstanding the foregoing, Party may use the Proprietary Information as shall be necessary in connection with the operation of the Cold Stone Creamery restaurant with which Party is employed or otherwise associated.

(f)    Notwithstanding the foregoing, the following shall not be subject to the provisions of this Section 1:

(I)    Information which is in the public domain as of the date of receipt by Franchisee;

(ii)    Information which becomes known to the public without a breach of any confidentiality agreement or provision in favor of Franchisor or Franchisee; and

(iii)    Information which is required by law to be disclosed or revealed, but only strictly to the extent required by law.

2. <u>Covenant Not to Compete.</u> Party shall not, during the term of Party's employment or other association with Franchisee and for the two-year period thereafter, directly or indirectly (as an owner, partner, director, officer, employee, manager, consultant, shareholder, representative, agent, lender or otherwise), be engaged in a business that manufactures, produces, markets or sells ice cream, frozen yogurt or any other frozen dessert product within, or for consumption within the United States.

3. <u>Reasonable Restraints; Remedies.</u> Party acknowledges that the covenants contained in this Agreement (including, without limitation, the territorial and time restraints) are reasonable and necessary and agrees that his failure to adhere strictly to the restrictions contained herein shall cause substantial and irreparable damage to Franchisor, Franchisee and to Franchisor's other franchisees. In the event of any breach by Party of any of the terms of this Agreement, Franchisor and/or Franchisee shall be entitled to institute and prosecute proceedings, at law or in equity, in any court of competent jurisdiction, to obtain an injunction to enforce the provisions of this Agreement and to pursue any other remedy to which Franchisor and/or Franchisee may be entitled. Party agrees that the rights conveyed by this Agreement are of a unique and special nature and that Franchisor's and Franchisee's remedy at law for any breach would be inadequate and agrees and consents that temporary or permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision hereof, without the necessity of posting bond therefor or proof of actual damages.

4. <u>Modification; Severability.</u> If the scope of any restriction contained in this Agreement is too broad to permit the enforcement of such restriction to its fullest extent, then such restriction shall be enforced to the maximum extent permitted by law, and Party hereby consents and agrees that such scope may be judicially limited or modified accordingly in any proceedings brought to enforce such restriction. Each covenant contained in this Agreement is independent and severable and, to the extent that any such covenant shall be declared by a court of competent jurisdiction to be illegal, invalid or unenforceable, such declaration shall not affect the legality, validity or enforceability of any other provision contained herein or the legality, validity or enforceability of such covenant in any other jurisdiction.

5. <u>General and Miscellaneous.</u>

(a) <u>Entire Agreement; Amendment.</u> This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whosoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing signed by each of the parties hereto.

(b) <u>Binding Nature of Agreement.</u> This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

(c) <u>Governing Law.</u> This Agreement and all questions relating to its validity, interpretation, performance and enforcement will be governed by and construed, interpreted and enforced in accordance with the laws of the State of Arizona, notwithstanding any Arizona or other conflict of laws provisions to the contrary.

(d) <u>Third Party Beneficiary.</u> Franchisor is an express third party beneficiary of this Agreement and may, directly or indirectly, enforce any obligation of Party hereunder.

**Party has read this entire Agreement carefully and fully understands the limitations that this agreement imposes upon him and acknowledges and agrees that those limitations are reasonable.**

EXECUTED as of the date first set forth above.

Susan Landgraf
Name and Signature of Party

Name and Signature of Franchisee

### AGREEMENT OF INTENT TO SUBLET

AGREEMENT, dated as of the date set forth at the end of this Agreement, executed by Cold Stone Creamery Leasing Company, Inc., an Arizona corporation ("Sublessor"), and the sublessee identified in Exhibit A to this Agreement ("Sublessee").

WHEREAS, Cold Stone Creamery, Inc., an Arizona corporation affiliated with Sublessor ("Franchisor"), and Sublessee have entered into that certain Franchise Agreement (the "Franchise Agreement");

WHEREAS, pursuant to the Franchise Agreement, the parties intend that Sublessee will establish and operate a Cold Stone Creamery® restaurant within the geographical area identified in Exhibit A to the Franchise Agreement;

WHEREAS, Sublessee has selected the premises described in Exhibit A (the "Premises") for the location of the Cold Stone Creamery® restaurant to be established and operated by Sublessee;

NOW, THEREFORE, in consideration of the foregoing premises and the execution and delivery of the Franchise Agreement by Franchisor, and the performance of Franchisor's obligations thereunder, the parties understand and agree as follows:

1.      Agreement to Sublease.  Sublessee agrees to sublease the Premises from Sublessor substantially in accordance with the terms set forth in Exhibit A and the terms set forth in the Sublease attached to the Franchise Offering Circular of Franchisor as Exhibit H.

2.      The Premises.  Sublessee acknowledges and agrees that (a) Sublessee has selected the Premises, (b) Sublessee has made an independent evaluation of the Premises and (c) Sublessee has concluded that the Premises has a reasonable opportunity of success as a Cold Stone Creamery® restaurant.

3.      Restrictions on Assignment and Further Sublease.  Sublessee acknowledges that it can only assign or sublease its interest in the Premises and the Sublease to a franchisee of Franchisor for the purpose of operating a Cold Stone Creamery® restaurant, and no such assignment or sublease can be made unless Sublessor consents to such assignment or sublease, which consent may be withheld by Sublessor, in its sole discretion.  Notwithstanding any consent of Sublessor, Sublessee will not be relieved of its obligations under this Sublease.

4.      Sublessor Not Obligated to Execute Lease.  Sublessee's obligations pursuant to this Agreement are subject to the execution of a lease for the Premises between the landlord of the Premises and Sublessor.  Sublessee understands and agrees that Sublessor is not obligated to enter into a lease for the Premises if it determines that the terms of the lease are not satisfactory to Sublessor, in its sole and absolute discretion.

5.      Governing Law.  This Agreement and all questions relating to its validity, interpretation, performance and enforcement will be governed by and construed, interpreted and enforced in accordance with the laws of the State of Arizona, notwithstanding any Arizona or other conflict of laws provisions to the contrary.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 68 of 74

6.    Acknowledgement. Sublessee acknowledges and confirms that Sublessee has selected the Premises for the location of the Cold Stone Creamery® restaurant to be established and operated by Sublessee and that the decision to establish and operate Sublessee's Cold Stone Creamery® restaurant at the Premises was made solely by Sublessee, without any reliance upon any information provided (if any), recommendation made (if any) or approval given (if any), by Sublessor, Franchisor, any area developer or any of their respective shareholders, directors, officers, employees, representatives, agents or affiliates. Sublessee accepts full responsibility for the consequences of Sublessee's decision.

EXECUTED as of _____ *1/28/04* _____

COLD STONE CREAMERY
LEASING COMPANY, INC.

By: *MICHAEL DISTEFANO*
    Name:
    Title:

By: _____

**David Andow**
**Exec Vice President**

Name of Sublessee: *MICHAEL DISTEFANO*

CHECK ONE:  Individual _____✓_____
             Corporation_____
             General Partnership_____
             Limited Partnership_____
             Limited Liability Company_____
             Other Entity (Identify)_____

EXECUTED BY: *Michael DiStefano*
         (Sign Name)

*MICHAEL DISTEFANO*
    (Print Name)

If executed on behalf of a corporation, a partnership, a limited liability company, or another type of entity, list title:

_____

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 69 of 74

Exhibit A
to
Agreement of Intent to Sublet


Name of Sublessee:


The Premises: *T.B.D .*




Lease Term:


Monthly Rental Rate:


Other Key Lease Terms:

# COLD STONE CREAMERY, INC.
## AFFILIATE TRANSFER AND CONSENT AGREEMENT

The Affiliate Transfer and Consent Agreement ("*Agreement*") is entered into by and among _____, a *Michael Distefano* ("*Assignor*"), *Franco Megka* a *Sharp Image Enterprise* "*Assignee*") and **Cold Stone Creamery, Inc.**, an Arizona corporation ("*Cold Stone*"), as of *June 15*, 2004.

    A.    Assignor currently operates a Cold Stone Creamery franchise (the "*Franchised Business*") pursuant to a Franchise Agreement between Cold Stone and Assignor dated *1/28/04*, _____ (the "*Franchise Agreement*").

    B.    Assignee is majority owned and controlled by Assignor.

    C.    Section 14(g) of the Existing Franchise Agreement, allows any transfer of the Franchised Business to a corporation, partnership, limited liability company or other entity that is majority owned by Assignor upon certain conditions, including, but not limited to, the condition that each person or entity that owns, directly or indirectly, a five percent (5%) or greater interest in the assignee signs and delivers an agreement to be bound and to guarantee in the form then being signed by new franchisees and their owners.

    D.    Assignor desires to transfer the Franchised Business to Assignee, and Cold Stone desires to consent to such transfer.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

    1.    *Consent.*  Subject to the terms and conditions of this Agreement, Cold Stone consents to the assignment of the Franchised Business to Assignee.  Notwithstanding the foregoing, Assignor agrees to remain bound by all applicable terms of the Franchise Agreement governing the rights and obligations of a franchisee upon expiration or termination of their franchise agreements, including without limitation, all provisions dealing with relinquishment of the use of Cold Stone's service marks, trademarks and other proprietary and/or confidential information.

    2.    *Agreement to be Bound.*  Assignee hereby acknowledges receipt of the Franchise Agreement, a true and correct copy of which is attached hereto as Exhibit A.  Assignee agrees to undertake and timely perform and discharge all of the obligations and liabilities of the franchisee under or in connection with the Franchise Agreement.

    3.    *Indemnification.*  Assignor covenants and agrees to indemnify, defend and hold Cold Stone harmless for, from and against any and all damages, losses, liabilities (absolute and contingent), fines, penalties, costs and expenses (including without limitation, reasonable counsel fees and costs and expenses incurred in the investigation, defense or settlement of any claim covered by this indemnity) with respect to or arising out of any demand, claim, inquiry, investigation, proceeding, action or cause of action that Cold Stone or any of its affiliates may suffer or incur by reason of Assignee's failure to comply with the terms of, or breach or default under or in connection with, the Franchise Agreement or this Agreement, both prior to and after the date hereof.

1180849v1/13863-0001

4. *Representations and Warranties of Assignor.* Assignor represents and warrants to Cold Stone as follows:

      a. Assignor is in full compliance with all of the terms of the Franchise Agreement, and there exists no default under or with respect to the Franchise Agreement by either Assignor, or to Assignor's knowledge, Cold Stone.

      b. As of the date hereof, Assignor has paid all sums due to Cold Stone by Assignor under the Franchise Agreement or otherwise.

5. *Representations and Warranties of Assignee.* Assignee represents and warrants to Cold Stone as follows:

      a. Assignee is a [corporation/limited liability company], duly and validly existing and organized under the laws of the state of *New York*, and this Agreement is a duly executed, valid and binding agreement of Assignee, enforceable against Assignee in accordance with its terms.

      b. Attached as <u>Exhibit B</u> is a Certificate of Good Standing with respect to Assignee issued by the state of Assignee's incorporation within thirty (30) days prior to the date of this Agreement.

      c. Assignee has adequate financial resources and professional ability to continue to operate the Franchised Business and comply with the terms of the Franchise Agreement.

      d. Assignee is not in any manner directly or indirectly involved in the conduct of a business competitive with the Franchised Business, nor competitive with any other franchise conducted by Cold Stone or its franchisees.

      e. Attached as <u>Exhibit C</u> is a true and correct list of each person (and his or her spouse), and each corporation, partnership, limited liability company or other entity that owns or controls, directly or indirectly, a five percent (5%) or greater equity interest in Assignee. Attached as <u>Exhibit D</u> are Agreements to be Bound and to Guarantee executed by each of such persons or entities, which Agreements to be Bound and to Guarantee are in the form currently being signed by new Cold Stone franchisees.

      f. All information provided by Assignee to Cold Stone with respect to Assignee and its owners is true, complete and correct in all respects and does not omit or fail to state any material facts.

      g. Assignee acknowledges, agrees and understands that the Franchise Agreement will terminate on _1/28/14_.

6. *No Novation.* The assignment of the Franchised Business shall not constitute a novation as between Cold Stone and Assignor, and shall not in any manner release Assignor from any liability to Cold Stone in the event of any breach by Assignor of the Franchise Agreement. Assignor hereby expressly guarantees the full and faithful performance of Assignee of all of its obligations and duties under and pursuant to the Franchise Agreement.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 72 of 74

7.    *Release.*    Assignor hereby releases and forever discharges Cold Stone and its shareholders, officers, directors, agents, employees, affiliates, attorneys, successors and assigns (collectively, "*Releasees*") of and from any and all obligations and defaults, actions, causes of action, suits, proceedings, disputes, rights, claims and demands, at law or in equity (whether real or contingent, known or unknown) that Assignor ever had, now has or may hereafter against any of the Releasees, arising out of or in connection with the Franchised Business and the Franchise Agreement prior to the date hereof, or arising out of the actions or omissions of any of the Releasees prior to the date hereof, whether such actions or omissions were willful, wanton, intentional, negligent or otherwise.

8.    *No Waiver.*    Neither Cold Stone's consent to the assignment of the Franchised Business by Assignor to Assignee, nor the terms of any agreement entered into between Assignor and Assignee to which Cold Stone is not a party, shall in any manner limit, waive, or alter any of Cold Stone's rights or obligations.

9.    *Entire Agreement.*    This Agreement supersedes any prior agreements, oral or written, with respect to the subject matter hereof. The parties to this Agreement understand and agree that no representations, warranties, agreements, or covenants have been made with respect to this Agreement by Cold Stone, other than those set forth herein, and in the Exhibits hereto, and that in executing this Agreement the parties are not relying upon any representation, warranty, agreement, or covenant of Cold Stone other than as set forth in this Agreement.

10.    *Further Assurances.*    Each of the parties shall take such further actions and sign such further documents as shall be reasonably requested by the others to effectuate the terms and conditions of this Agreement. In addition, Assignee shall execute and deliver to Cold Stone all such documents, guarantees, and applications as reasonably requested by Cold Stone of its franchisees at the commencement of a franchise relationship and from time to time during such relationship.

11.    *Governing Law.*    This Agreement shall in all respects be interpreted, enforced and governed by the internal laws of the State of Arizona, notwithstanding any conflict of laws or provisions to the contrary.

Case 3:11-cv-00124-RJC -DSC   Document 1-2   Filed 03/11/11   Page 73 of 74

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

COLD STONE CREAMERY, INC.

By: _____
Its: _____
      **David Andow**
      **Exec Vice President**

ASSIGNOR:

_Michael DiStefano_

By: _Michael DiStefano_
Its: _co-owner_

＊ _Franco Treglia_

_Franco Treglia_
_co owner_

ASSIGNEE:

_Sharp Image Enterprises_

By: _Michael DiStefano_
Its: _president / managing_
          _Member_

＊ _Franco Treglia_

_Franco Treglia_
_managing member_

[Spouse of ASSIGNEE

_Nicole DiStefano_                    ]